Filed 6/17/13  Marriage of H. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of CRYSTAL and SHAWN H. | |
| CRYSTAL H., | D061388 |
| Appellant, | |
| v. | (Super. Ct. No. DN106123) |
| SHAWN H., | |
| Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Gregory W. Pollack, Judge.  Affirmed in part, reversed in part.

Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, Benjamin Lewis Wagner, Nathan R. Hamler and Justin S. Nahama for Appellant.

Law Office of Daniel V. Burke, Daniel V. Burke and Pierre A. Domercq for Respondent.

O'Melveny & Myers, Michael Walsh and Alec Johnson as amicus curiae on behalf of Justice for Children, Domestic Violence Legal Empowerment and Appeals Project, and Leadership Council on Child Abuse and Interpersonal Violence.

## I.

## INTRODUCTION

Crystal H. appeals from a judgment of dissolution in which the trial court made certain orders regarding custody of her two sons and visitation of the boys with their father and Crystal's former spouse, Shawn H.[1] In criminal proceedings, Shawn was convicted of forcible oral copulation of Crystal and was sentenced to a six-year prison term. During the pendency of those proceedings, a restraining order was in place ordering Shawn to stay away from, and not contact, Crystal and their sons.

Crystal filed a marital dissolution action, which proceeded concurrently with the criminal proceedings. At some point after Shawn had posted bail in the criminal case, he sought visitation with the boys.[2] After a trial on issues of custody and visitation, the trial court issued an order setting forth a number of different requirements related to custody of, and Shawn's visitation with, the boys. The court awarded Crystal sole legal and

---

[1]     Because the parties share the same last name, we will refer to them using their first names.

[2]     Shawn was subsequently convicted of a felony in the criminal case and was sentenced to prison for six years prior to the court's ruling on Shawn's request regarding custody and visitation. By the time the court ruled on the custody and visitation matters in this case, Shawn was in custody, serving his sentence.

physical custody and denied Shawn any visitation or telephonic contact with the boys while he is in prison.

The trial court also ordered that upon Shawn's release from prison, which at the time the court made the order was approximately three years in the future, "[t]here will be a reunification between the children and their father." The court ordered that immediate reunification therapy should begin upon Shawn's release, and that Shawn must undergo personal rehabilitative therapy, including completion of a domestic violence course and participation in individual therapy. However, the court indicated that the reunification process could proceed immediately, concurrently with Shawn's personal rehabilitation.

On appeal, Crystal challenges the portion of the trial court's order mandating reunification and requiring that the reunification process between Shawn and the couple's sons begin immediately upon Shawn's release from prison. After reviewing the record, we conclude that to the extent the trial court's order mandates reunification and requires that the reunification process begin immediately upon Shawn's release from prison, thereby allowing for immediate contact between the boys and Shawn, the trial court abused its discretion. We therefore reverse that portion of the order.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *General background*

Crystal and Shawn were married in 1996 and have two sons, C.H. (born in October 2002) and W.H. (born in May 2005). C.H. has been diagnosed with autism.

3

Crystal was the primary breadwinner for the family. After C.H. was born, Shawn stayed home to take care of him. Shawn later cared for both boys after W.H. was born.

In 1998, Shawn was arrested and charged with three battery-related counts after an incident involving Crystal. Shawn pled guilty to one count of violating Penal Code section 243, battery, and was sentenced to two days in local custody and three years of probation. In relation to that incident, Shawn completed a 52-week domestic violence program.

According to Crystal, Shawn committed other incidents of domestic violence after the boys were born, including threatening to kill her. Shawn denied being physically abusive or threatening to harm Crystal.

B.   *The incidents just prior to the parties' separation and Shawn's arrest*

On March 22, 2008, after a church function, Shawn became upset with Crystal in the presence of the boys for no apparent reason. Shawn slapped a snow cone out of Crystal's hand and then pressed on her windpipe, making it difficult for her to breathe. Crystal began to cry and the boys appeared frightened. Shawn denied that this incident occurred.

On March 28, Crystal came home from work at around 3:00 and went into the couple's bedroom to take a nap. The children were at home in another room. Crystal had previously placed a tape-recorder in a dresser drawer, and she recorded the interaction between herself and Shawn that afternoon. Shawn began accusing Crystal of lying to him, and they argued. Crystal can be heard crying and sobbing throughout the recording. At some point, Shawn apparently requested some sort of sexual act, and Crystal replied

4

that she did not "want to." Later Shawn can be heard saying to Crystal, "Do you want to get butt-fucked?" and "You suck or get butt-fucked." Crystal repeatedly said "no," asked Shawn to stop, and told him that he was hurting her. Crystal also told Shawn that she was concerned about the children and asked him if they could wait until the children were asleep. Despite Crystal's pleas for him to stop, Shawn continued to sexually assault her.

Among the things Crystal and Shawn can be heard saying on the recording are:

"Crystal: (Unintelligible) you're choking me. You're choking me, please!

"Shawn: How does it feel? Hurry up and fucking do this (unintelligible).

"Crystal: No.

"Shawn: (Unintelligible). You think this is a fucking joke?"

"[¶] . . . [¶]

"Shawn: Keep begging now.

"Crystal: I'm sorry, I'm scared. I don't want to do it like this Shawn.

"Shawn: Well tough shit. I don't want to be lied to.

"Crystal: I don't want to be raped. I don't want to be raped.

"Shawn: I don't want to be lied to.

"Crystal: I don't want to be raped. Nobody deserves to be raped Shawn. Please, please.

"Shawn: I'll get a knife downstairs if I fucking have to.

"Crystal: Why are you saying that?

"Shawn: Then shut up.

5

"[¶] . . . [¶]

"Shawn:  I'm tired of this one.

"Crystal:  No, no, (unintelligible) no, no, no, oh my God, my God . . . .

"Shawn:  (Unintelligible).

"Crystal:  No, stop!  Just regular!  I can't do that honey, please I can't, I can't, I can't, I can't.

"Shawn:  You start sucking.

"Crystal:  Please (unintelligible).

"Shawn: Stop crying and start sucking.

"Crystal:  Okay.

"Shawn:  Leave that alone as a reminder.  I don't care if I tear your asshole inside out.  I'm tired of being lied to."

Later, Shawn said to Crystal, "You're not that dumb to play fucking stupid with me.  Maybe it works with work but I'm fucking sick of it.  You (unintelligible) me enough.  I'll be sure to carve that on your fuckin' head when I dump your body."

According to Crystal, three days later, on April 1, 2008, she arrived home from work early.  When she arrived, Shawn confronted her about where she had been that day.  He had been tracking her cell phone and told her to go to the computer to check it herself.  While she was sitting in front of the computer, Shawn began to choke her and she felt herself going in and out of consciousness.  When Shawn stopped choking her, he threatened to "punish [her] for [her] lies," and said that he was "going to fuck [her] ass."  Crystal testified that Shawn proceeded to anally rape her.  During this incident the

6

children were upstairs. The only thing preventing them from coming downstairs was a baby gate.

Later that night, Crystal ran out of the house and hid in some bushes. She called 911, and waited for police to arrive. When the police arrived, they arrested Shawn. Crystal provided the police with the audio recording of the previous attack that occurred on March 28. She was taken to the hospital where a SART exam was performed.[3]

The following day, April 2, 2008, Crystal obtained a Domestic Violence Temporary Restraining Order to protect her and the children.

Crystal explained at trial in this matter that in the past Shawn had repeatedly threatened to kill her if she left or went to the police. She believed his threats, which is why she had never called the police regarding Shawn's abuse when that abuse started to increase after Shawn's father died in 2005.[4]

C.  *Shawn's criminal proceedings*

The People charged Shawn in three felony counts with forcible spousal rape, forcible sodomy, and forcible oral copulation. After many continuances of the trial date, Shawn's criminal case went to trial on August 4, 2010. After three weeks of trial, a jury convicted Shawn of forcible oral copulation, but deadlocked on the other two counts.

---

[3]    "SART" stands for "sexual assault response team." (See, e.g., *People v. Taylor* (2010) 48 Cal.4th 574, 588.)

[4]    Because the couple lived in a gated community, Crystal feared that Shawn would harm her before the police could gain access to their house.

The trial court sentenced Shawn to six years in state prison. Shawn's conviction was affirmed on appeal, and is now final.

During the pendency of the criminal proceedings, restraining orders remained in effect preventing Shawn from coming within 100 feet of Crystal or the children.

D.      *The dissolution proceedings*

According to the family court records, Crystal had filed a petition for dissolution of her marriage to Shawn more than a year prior to the sexual assault, on February 1, 2007. However, other documents in the family court file identify the date of separation for the parties as April 1, 2008.

On December 11, 2009, Shawn filed a request for an order to show cause (OSC) seeking visitation with his children. In those papers, Shawn explained that he was out on bail and wanted to re-establish contact with his children, whom he had not seen since his arrest due to the domestic violence restraining order that was in place. The court ordered the parties to attend a custody mediation set for February 2010. Crystal did not appear for the mediation.

On March 3, 2010, Shawn filed another request for an OSC seeking joint custody of the children and visitation with them.

A family court services mediator's report dated May 21, 2010 indicated that Shawn and Crystal participated in a mediation conference on May 13 of that year. The mediator recommended that the court continue to order that there be no contact between Shawn and the children until Shawn's criminal case was resolved.

8

The court held hearings on a variety of matters raised in the family court proceeding on June 7, 2010, June 21, 2010, December 3, 2010, March 30, 2011, and April 4, 2011.

At the June 7, 2010 hearing, the trial court appointed Dr. Stephen Doyne as a neutral expert, pursuant to Evidence Code section 730, to provide a report to the court on the questions of custody and visitation, taking into consideration the multiple potential scenarios that might occur, depending on the outcome of Shawn's criminal trial.

Dr. Doyne completed his report on March 29, 2011. In that report, Dr. Doyne indicated that "the totality of the data for the present assessment indicate that [Shawn] still presents a high risk to the mother as well as the children unless he takes part in a more intense rehabilitation plan . . . ." Dr. Doyne concluded that "the burden rests squarely on Mr. [H.]' shoulders to address the issues of impulsivity which can result in aggressive and unpredictable or even dangerous violent acts."

Dr. Doyne explained in his report that he had conducted psychological testing of Shawn using an assessment tool identified as the "MMPI-2 inventory." Based on this testing, Dr. Doyne determined that Shawn "has recurrent problems with impulse control which leads to a potential for amoral and/or antisocial conduct." According to Dr. Doyne, "[t]he most common diagnoses with this personality pattern are Antisocial and/or Borderline Personality Disorders." He added that "the clinical testing also suggests narcissistic and paranoid features that could also be described as chronic borderline psychotic characteristics."

9

Dr. Doyne noted in his report that "currently both boys do not want to see Mr. [H.] with [C.H.] recalling the father being physically abusive to him and his mother although [W.H.] was too young to remember any assaults but is aware of the previous domestic violence in the home." Dr. Doyne indicated that C.H., who was eight years old at the time Dr. Doyne interviewed him, had told Dr. Doyne about the incident during which Shawn poked Crystal's throat, choking her. C.H. said that he felt " 'really mad and tried to get him to stop' " and also said that he felt " 'mad because I didn't want him to hurt my mom.' " C.H. added that Shawn " 'hit me too and left awesome marks.' " W.H., who was five years old when Dr. Doyne interviewed him, also indicated that he was angry at Shawn and said that he did not want to see his father. W.H. seemed uncomfortable talking about his family, but eventually spontaneously said, " 'My dad is in jail.' " W.H. explained that Shawn "had 'hit my Mom,' " but said that he had not seen this happen. However, he added that he " 'heard Mom scream.' " W.H. told Dr. Doyne that he thought Shawn " 'should stay in jail forever because that is where he needs to be.' " When asked how he thought his mother felt about Shawn, W.H. said, " 'She just thinks she doesn't want to see him again.' "

Dr. Doyne ultimately concluded that "[a]t the present time, unless and until Mr. [H.] squarely addresses the risk factors outlined in this report, it is not in the best interests of the children to have any contact with him." Dr. Doyne recommended that "[p]rior to visitation being considered" between Shawn and the boys, Shawn should complete a rehabilitation plan upon being released from prison. Dr. Doyne indicated that the rehabilitation plan should include completion of a 52-week domestic violence course and

10

a year of individual psychotherapy sessions, at least twice each month, with a licensed mental health professional familiar with working with sexual offenders, in order to lower Shawn's risk factors. Dr. Doyne also recommended that the boys see licensed mental health professionals prior to any visitation, so that the mental health professionals could determine their readiness to see their father. Finally, Dr. Doyne recommended that once these recommendations have been met, and the boys' therapists have determined that contact with Shawn is appropriate, then visitation between Shawn and the boys could occur in a setting supervised by a reunification therapist, and the reunification therapist could later determine whether, and if so when, expansion of visitation might be considered.

At the March 30, 2011 hearing, the trial court noted that the domestic violence restraining order protecting Crystal would be in effect for the full five-year period available under the law, and indicated that the court would be willing to reissue that restraining order if Crystal were to seek an extension as the five-year period came to a close. However, the court declined to issue a domestic violence restraining order to prevent Shawn from having contact with the children. In denying Crystal's request for such an order, the court stated, "So I am not going to grant the restraining order as to the kids. I'm denying that. Okay. And the reason—the primary reason I'm denying it is

dad's wrongful behavior was directed against you.  It was not directed against the children."[5]

At that same hearing, the trial court initially indicated that the court wanted Shawn to participate in therapy prior to having physical contact with his children, consistent with Dr. Doyne's recommendations.  The court said, "What I would like to see, I would like to see dad go through all of this therapy recommended by Dr. Doyne and, thereafter, be successfully reunited with his children.  I think that would be in the best interest of the kids, and it will certainly be in dad's best interest.  This is what I want."

Later during the March 30, 2011 hearing, the trial court told Crystal that "it looks like it is heading towards reunification at some point in time," and, therefore, that what she "need[ed] to do is try to help it along, as tough as that might be."  The court then said:

> "I went to a seminar put on by Dr. Joan Kelly . . . .  [¶] . . . [¶]  Dr. Kelly is a world renown[ed] psychologist who deals with parenting issues, and she talked about a study that seemed really important. And that is that in these cases where one parent does things to turn the child against the other parent, it works in the short [term].  But what they are finding is that these kids who were pulled away from the other parent by the good parent, as they get older they tend to resent that.  There is a boomerang [e]ffect.  And then, in the long run, the other parent becomes the one they want to be with.
>
> "So apply it to here.  If these kids sense you have been bad mouthing Mr. [H.] and then one day there is kind of a reunification, he mellowed over time—they hear your version—they may end up resenting you [for] keeping them from him during these years. Okay.  So just keep that in mind."

---

5    It appears that the court was actually lifting the domestic violence restraining order that had been in place insofar as it pertained to the children, as the court indicated later in the proceeding.

Crystal responded that she was aware of alienation studies. With respect to the court's suggestion that Crystal had been "bad mouthing" Shawn to the children, Crystal told the court, "I don't say anything. They have their own knowledge of what they witnessed, and they don't—that is what I'm saying. Once they learn to the full extent of what happened, I think they will only get more angry because—." The trial court interrupted Crystal, stating, "When I was reading Dr. Doyne's report—he didn't comment on this—the way he was quoting these kids at such a very young age, it really seemed like we were hearing your testimony. That is the impression I got. [¶] And I don't blame you. You were clearly sexually assaulted. The court has found that. And that you might have said things to the kids consistent with your anger at him is not surprising."

At the April 4, 2011 hearing, Dr. Doyne appeared telephonically. The trial court asked him about his thoughts concerning whether it would be detrimental to the children to receive cards and letters from Shawn while he was in prison. Dr. Doyne indicated a hesitancy to allow this, but stated that he believed both boys would benefit from therapy regarding the issues surrounding their family situation, and that a treating therapist might be better able to address the question. Dr. Doyne explained, "When I've had cases like this where there's been violence in the home, the children are sometimes very reluctant [to have contact with the violent parent] because of their fear and anxiety, so I see the court's question [regarding cards and letters from Shawn] as more of a therapeutic issue." Dr. Doyne explained:

> "So there's kind of a psychological readiness for the children that has
> to take place first. When I've been in a situation like this, you have
> to work with the children to the point where you reduce their

13

anxiety. For example, if there were a present or a card or something like that, I would talk to them ahead of time and ask them if they wanted to see it. They might get mad at me for even bringing it up, and I would say, 'Well, you're in charge,' giving a child some control so they can manage their anxiety . . . . So you find a way to, as a therapist, reduce their anxiety to the point that they might be ready.

"Also, in my experience, children who have witnessed violence, domestic violence, have to know somehow that this person is sorry or they've taken some sort of responsibility. Why? Because they don't want to be in a position where they might be afraid again, so back to the burden being on the father here to do his psychological homework. But if it's introduced too fast, my opinion would be it would be contraindicated and work against the children having a satisfactory adjustment to a father who has taken some responsibility.

"It is my hope that Mr. [H.]s makes a significant change in his life. I think it would be better for the boys long term, when they are ready, if he could participate in some way, as long as he is healthy and they are ready for that."

After some additional questioning by the attorneys and the court, including questions about Crystal's role "in this whole process," Dr. Doyne eventually said, "When I've been in the mental health role here, you take your cues from the children. I am not concerned about the mother misguiding them. That's not a worry. I have not evaluated her. That was not my task. But I feel she wants what's best for the boys; and, ultimately, they would be better off with a healthy father in their life."

At the conclusion of the April 4 hearing, the court stated, "In terms of my temporary order, a tentative would be to go on precisely what he [Dr. Doyne] recommended. It seemed to make a lot of sense. So with regard to Mr. [H.] contacting the children, we don't want any of that to take place until the kids are in therapy and the therapist weighs in on the issue and makes that recommendation. Mr. [H.] is still the

14

father, of course, and I think he ought to have the right to contact the therapist. Mom has sole physical and legal custody. That will remain. In terms of prison visitation, I'm not going to order any of that. If mom somehow sees the situation different over time and chooses to take the children for a visit, then, obviously, she's free to do that." The court and the parties anticipated that a trial on the issue of custody would begin on July 1, 2011.

As anticipated, the court held a trial on the issue of custody and visitation in this matter on July 1. The court's appointed expert, Dr. Doyne, testified regarding his evaluation and report. Shawn called Dr. Robert Simon, a licensed psychologist who practices "forensic psychology exclusively in the area of family law," as a defense expert, to address Dr. Doyne's evaluations and recommendations.

Dr. Doyne testified that based on his interviews of the children, he found them to be credible and did not believe that their "fears, concerns, or statements about Mr. [H.], and what had occurred in the family with respect to violence and mistreatment, was created or instilled in them by their mother." Dr. Doyne also stated his view that "because of [Shawn's] personality profile, his problems with impulse control, the history of domestic violence, he presents certain risks to the children."

Consistent with his report, Dr. Doyne testified:

> "From my perspective, the burden first falls on Mr. [H.] to ensure that there are no risk factors in terms of mistreatment of the children and/or violence in the family, and that that is his responsibility to address first. And I believe I spelled out kind of a stepwise plan. I think dad has to be a primary concern in terms to reduce risk factors.

15

"Then we have, on the flip side of the coin, the children, both boys, saying that they don't want to have contact, they're afraid of him, basically. And their feelings have to be considered. So we'll work on both sides of the equation, but unless and until Mr. [H.] addresses the issues that I think pose risk factors for the children, then—then any kind of visitation would be premature."

In describing why he found C.H. credible, Dr. Doyne explained, "He was very vivid in his description. . . . His anxiety, when he was talking about this [i.e., the choking incident], is palpable, comes through. He's afraid for himself. He was afraid for his mother . . . . [¶] . . . [¶] . . . But he came across loud and clear. I did not feel he was being coached. He didn't come in and kind of unroll a script." Dr. Doyne expressly testified that he did *not* have the impression that Crystal had "coached the children on how to speak to" him or that she had "coached the children against their father," or was "alienating or trying to alienate the children from their father."

When asked what repercussions might occur "if Shawn were just suddenly reintroduced into [the boys'] lives," Dr. Doyne said, "Well, with [C.H.] I think you'd see some just anxiety off the charts, and he would be fearful, I would predict, might have regressive-type symptoms, sleep disturbances, fears." Dr. Doyne explained, "So they [the children] get into these avoiding behaviors. That's why they have to be brought along, particularly a special needs child." When asked about C.H. possibly regressing, Dr. Doyne stated, "When kids get scared, they have anxiety symptoms, nightmares, sometimes they wet their pants, or have accidents, defecate. They—for him he could stutter more, it could affect his ability to do schoolwork, nightmares. There's a whole range of things."

16

Dr. Simon testified that he is a "specialist in forensic psychology assessment procedure and what is good and what is less than good." He explained that he reviews the work of other psychologists. Dr. Simon did not interview either of the parties or the children. Rather, Dr. Simon reviewed Dr. Doyne's report and raised questions about the quality of Dr. Doyne's assessments, including Dr. Doyne's conclusions based on the MMPI-2 assessment tool. In particular, Dr. Simon questioned the reliability of Dr. Doyne's MMPI-2 results based on the fact that Shawn had to take the test while in prison, which, he asserted, Dr. Doyne had not sufficiently accounted for. Dr. Simon also suggested that in his opinion, Dr. Doyne had used the information that he gathered to *confirm* his already-determined outcome, rather than using it to *inform* the outcome.

Upon the conclusion of the presentation of evidence and final arguments by the attorneys, the trial court stated:

> "Here are my thoughts. I think that dad was probably what I would say a mean dad. I think, on the continuum of hateful, vicious, malicious guy to his kids, on one end, and the warm and fuzzy Ward Cleaver on the other[,] you know, he's you know, not exactly in the middle. I think he's a little bit more towards the mean side. Now having said that, do you say that just because dad's mean that he loses his kids? No.
>
> "A parent doesn't have to be perfect or even a good parent to still be a parent. And I think what happened here was that dad was an acceptable parent on the mean side. I think he did occasionally use corporal punishment, but in California that's permissible, so long as it's not excessive or unreasonable. And then in March or April of 2008, he committed some very wrongful acts as to his wife, and he's now incarcerated because of it.
>
> "But do we conclude necessarily that he was this bad dad, so that he shouldn't have any contact with the kids for years and years and years? I don't reach that conclusion. I think a lot of the testimony

17

and the arguments made by mom in this trial ha[ve] really been kind of an attempt to create a revision[ist] history as to what kind of dad he was, because the fact of the matter was, during this period where mom now says that he was this vicious, cruel abuser, who because he abused the children, shouldn't even see the kids, she was each day going to work being a stockbroker knowing full well she was leaving these kids who were at a helpless age, under his watch. Okay?

"[¶] . . . [¶]

"So what we have here is we have a mother who cares very much for her children, and a mother who's willing to take action when she feels it's appropriate. And I just can't square that with her going off to work every day as a stockbroker leaving her kids with someone she truly believes is a monster. Now, does she now feel he's a monster? Sure. Because of what he did to her.

"But just because Mr. [H.] did bad things to her, doesn't mean that these kids lose their father. There are a lot of dads in prison who have done things worse than what Mr. [H.] did, who have an ongoing relationship with their children. And I do not believe that what Mr. [H.] did was directed toward the children. I think, obviously, there's some collateral damage. Any time that one parent does something bad to the other parent, there's collateral damage."

The court went on to acknowledge that Shawn's conduct had caused some incidental harm to the children, but again expressed the view that Shawn's conduct had been directed toward Crystal, and not the children. The court said, "So I feel very strongly that there must be reunification here. [¶] And the problem I have—the main problem I have with Dr. Doyne's report . . . is he has set forth a plan which is destined to fail." According to the court, Dr. Doyle's plan was "destined to fail" because (1) "he said, basically there'll be no reunification attempts until dad has been out of prison for one year. Okay? [¶] So he's essentially decided that Mr. [H.]' sentence should be a year longer"; and (2) because Dr. Doyne suggested that visitation can begin when the children

18

are " 'ready to have contact with their father under a therapeutic supervisor' " and that is "never going to happen" because the children are "young and impressionable and subject to suggestibility and approval-driven, totally under mom's watch."

The trial court went on to explain the genesis of the court's thinking on this issue:

> "There was a reference here to Joan Kelly. Joan Kelly is a national expert in this regard. And I'm not basing my decision on what I'm about to say, because it's not in evidence, but I was at that seminar with Joan Kelly and I went out to lunch with Dr. Kelly. We didn't talk about this case, but she said,—'cause I asked her, just in general terms, not even thinking about this case, what do you do with the scenario where you've got one—you've got a child totally aligned with one parent and wants no part of the other parent.
>
> "And she said, 'What you don't do is you don't send that child to individual therapy and then allow the child and the therapist to determine when they want to reunite.' She said, 'We have found that to be a total waste, it doesn't work.' She said, 'What we have to do in that scenario is refer the kids or the kid and the parent to a family counselor or conjoint therapist.' "

Immediately after making these comments, the trial court concluded, stating, "So we're not going to do what Dr. Doyne is suggesting here."

The court proceeded to outline a plan to give Crystal sole legal and physical custody of the children, with no visitation with Shawn while he remains incarcerated. The court indicated that Shawn would be permitted to send cards and letters to the children. Crystal is to share those items with the children unless she comes across something that she feels is inappropriate, in which case she may come to the court and allow the court to decide whether the material should be shared with the children.

The court also indicated that as soon as Shawn is released from prison, reunification between the children and Shawn shall occur, before Shawn completes any

19

domestic violence classes or participates in any individual therapy. The court stated, "At the same time that's going on [i.e., Shawn's participation in a 52-week domestic violence course and Shawn's individual psychotherapy twice per month], I want a reunification therapist involved in this case. I want that reunification therapy to start immediately." Apparently referring to Dr. Doyne's recommendation that Shawn be required to *complete* a rehabilitation plan, including a 52-week domestic violence course and a year of individual psychotherapy "*prior to* visitation being considered" (italics added), the court stated, "It doesn't have to wait until the 52-week period's gone. It doesn't have to wait until he's had, you know, a year of individual therapy. I want it started immediately."

Expounding on the issue of reunification therapy, the court stated, "Different therapists have different philosophies about reunification. And I want you to get someone who is very pro-reunification. There are many cases more difficult than this in the juvenile court setting where reunification has been successful, and different psychologists come from different schools of thought. I don't want you to get a reunification psychologist who feels his role is to determine whether reunification is possible. [¶] I want a reunification therapist who believes that it can be done, will be done, and will show us how it can be implemented."

The court later addressed Shawn, stating, "I want your reunification to take place on an expedited basis, as soon as you get out." After Shawn commented that he had already restarted the 52-week domestic violence course in 2009 and had completed 30 weeks of the course, the court said, "I want you to start from the beginning, but, again, it's

20

not holding back reunification.  *You're not going to wait an extra day before seeing these kids because I'm ordering this*." (Italics added.)

When asked to clarify whether the parties should be looking for one or two therapists, the court explained that the court envisioned that there would be multiple therapists involved in this matter: "Well, there[ are] going to be several.  There's going to be Mr. [H.]' individual [therapist] when he gets out.  There's going to be [C.H.'s] now.  And then there's going to be a reunification therapist when Mr. [H.] gets out, for him and [C.H.]."  It appears from the court's comments that the court envisioned that Shawn and the children would participate in joint reunification therapy immediately upon Shawn's release, meaning that the boys would have contact with Shawn well before he completed his personal rehabilitative therapy.

Toward the end of the proceedings, the court and the attorneys discussed other matters, and noted that issues related to the division of property between the parties and attorney fees and sanctions would be determined at a future date.

The trial court entered a document entitled "Findings and Order After Hearing" on December 14, 2011, in which the court set forth its final determinations with respect to the issues of custody and time-sharing of the children in the dissolution matter.  That order provides, in relevant part:

"**B.        Custody & Visitation**

"3. Pursuant to Family Code section 3011, the Court finds that, in the best interests of the children, Crystal [H.] shall have sole legal and physical custody of both children.

21

"4. Shawn [H.] is incarcerated in prison.  At this time it is not in the children's best interest to have prison visitation.  Shawn is not to have visitation with the children while he is in prison unless Crystal [H.], who has sole physical and legal custody, chooses to allow such visitation.

"5. In addition, Shawn [H.] may not telephone the children from prison unless Crystal [H.], who has sole legal and physical custody, chooses to allow such telephone contact.

"6. Shawn [H.] may, however, write letters and send drawings to the children from prison.

"7. If Crystal deems Shawn's letters to the children to be inappropriate, she may withhold them, and then appear ex parte for a judicial determination as to their appropriateness.

"**C.       Reunification**

"8. There will be a reunification between the children and their father.

"9. Shawn shall complete a 52-week Domestic Violence course.  The course does not have to be completed before the commencement of the reunification process.  The Court, however, anticipates that Shawn will start the 52-week course immediately upon his release from prison.

"10. Shawn shall participate in individual therapy twice monthly, with a licensed mental health professional who is experienced in the treatment of sex offenders.

"11. Reunification therapy shall begin immediately after Shawn is release[d] from prison.  Reunification therapy shall be with a therapist who has an orientation that is pro-reunification.

"**D.       Domestic Violence Restraining Orders**

"12. The Court will maintain the Domestic Violence Restraining Orders that are in effect to protect Crystal from Shawn in place as long as Crystal has a reasonable apprehension of fear.

22

**"E.** **Other**

"13. Neither parent shall make negative or disparaging remarks about the other.

"14. Crystal shall send monthly reports about the children to Shawn at the first of each month." (Fn. references omitted.)

Crystal filed a timely notice of appeal.[6]

III.

DISCUSSION

Crystal challenges section "C" of the trial court's Order—i.e., that portion of the Order that states that there "will be a reunification" between Shawn and the couple's sons and that reunification therapy is to begin immediately upon Shawn's release from prison in May 2014, and imposing additional conditions related to the "reunification" of Shawn and his sons

A. *Legal standards*

"The standard of appellate review of custody and visitation orders is the deferential abuse of discretion test." (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32

---

[6]     In his brief on appeal, Shawn argues that Crystal's appeal from the trial court's order has been rendered moot by the filing of a subsequent judgment in this case on June 21, 2012.  However, it is clear that the order from which Crystal appealed was a final order regarding custody and visitation, and that the final judgment in the dissolution action incorporated the custody order in question, in addition to determining other matters in the dissolution action.  In accordance with the rules proscribing liberal construction of a notice of appeal, we will treat Crystal's notice of appeal as a valid, albeit premature, appeal from the subsequent judgment.  (See Cal. Rules of Court, rule 8.104(e).)  For ease of discussion we will refer to the portion of the judgment at issue in this appeal as the "Order."

(*Burgess*).) "The precise measure is whether the trial court could have reasonably concluded that the order in question advanced the 'best interest' of the child." (*Ibid*.)

In an initial custody and visitation determination, a trial court, considering all of the circumstances, has the widest discretion to choose a parenting plan that is in the best interests of a child. (*Burgess*, *supra*, 13 Cal.4th at pp. 31-32; Fam. Code, § 3040, subd. (c).)[7] In making a determination of the best interests of a child, a trial court should consider various factors, including the health, safety, and welfare of the child (§ 3011, subd. (a)), the nature and amount of contact with both parents (*id*., subd. (c)), "[a]ny *history of abuse by one parent* or any other person seeking custody" against "[a]ny child" and/or "[t]*he other parent*" (*id*., subd. (b)(1), (b)(2), italics added), and which parent is more likely to allow the child frequent and continuing contact with the noncustodial parent (§ 3040, subd. (a)(1)).

A trial court abuses its discretion if "there is no reasonable basis upon which the court could conclude that its decision advanced the best interests of the child." (*In re Marriage of Melville* (2004) 122 Cal.App.4th 601, 610.) "[A]ll exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue." (*People v. Russel* (1968) 69 Cal.2d 187, 195.) Thus, a discretionary decision may be reversed if improper criteria were applied or incorrect legal assumptions were made. (*Linder v. Thrifty Oil Co*. (2000) 23 Cal.4th 429, 435-436.)

---

7       Further statutory references are to the Family Code unless otherwise indicated.

There is a stated legislative policy in California that domestic violence is detrimental to a child living in a household where it occurs. Specifically, section 3020, subdivision (a), sets forth the Legislature's findings and declarations in connection with custody of minors, and provides in pertinent part: "The Legislature finds and declares that it is the public policy of this state to assure that the health, safety, and welfare of children shall be the court's primary concern in determining the best interest of children when making any orders regarding the physical or legal custody or visitation of children. The Legislature further finds and declares that the perpetration of child abuse or domestic violence in a household where a child resides is detrimental to the child."[8] Importantly, domestic violence need not be directed at a child himself or herself to be considered detrimental to the welfare of that child.

B.      *Analysis*

We conclude that the trial court abused its discretion in rendering section C of its order, under the heading "Reunification." In requiring reunification between Shawn and the children, the order *assumes* that reunification will be in the children's best interests

---

[8]      In connection with this policy, section 3044, subdivision (a), provides for a rebuttable presumption "that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child." As a result, where a court finds that a party seeking custody of a child "has perpetrated domestic violence against the other party . . . within the previous five years," the rebuttable presumption is triggered and "may only be [overcome] by a preponderance of the evidence." (*Ibid*.) Although the court awarded Crystal sole legal and physical custody in this case (and thus did not award Shawn joint legal or physical custody), we note this statutory provision for the purpose of demonstrating the significance of the legislative policy of being protective of children's interests in situations involving domestic violence.

25

three years in the future. The court made this assumption despite Dr. Doyne's testimony that Shawn presents a "high risk" to the children and that "unless and until Mr. [H.] squarely addresses the risk factors outlined in this report, it is not in the best interests of the children to have any contact with him," and despite the complete absence of any evidence indicating that the immediate commencement of the reunification process between these children and their father upon his release from prison would be in their best interests.

1.    *The court's order is premature and fails to take into account the evidence available to the court at the time the order was made*

The court's order with respect to "reunification" is vague and ambiguous, in that it is not clear precisely what the trial court intended when ordering, in paragraph 8 of the order, that "[t]here will be reunification between the children and their father." The order is also premature in assuming what will be in the children's best interests with respect to reunifying with Shawn three years in the future. Further, there is no evidence that would support such an order.

In ordering that "[t]here will be a reunification between the children and their father" the trial court presumes to make a determination as to what will be in these children's best interests at a time several years in the future, despite the fact that any number of variables could change between the time the court made the order and the time that Shawn is ultimately released from prison. In this respect, the order is wholly premature and fails to recognize that the court cannot discern in the present what will be in the children's best interests at that point in time. The court repeatedly stated on the

26

record that the court wanted "reunification" between Shawn and the children to begin as soon as Shawn is released from custody. At one point the court said, "You're not going to wait an extra day before seeing these kids because I'm ordering this." At another point, the court stated, "I want your reunification to take place on an expedited basis, as soon as you get out." The court's order fails to consider the fact that by the time the children are to begin visitation with their father, many years will have passed since they will have had any contact with him at all, and that the circumstances three years in the future may not support such an order.

Further, the trial court disregarded the opinion of its own court-appointed expert, who expressed the view that Shawn should participate in multiple avenues of rehabilitation therapy and that reunification should not occur until and unless the children were ready for it to occur after undergoing their own personal therapy. There was no evidence before the court that immediate reunification therapy between Shawn and his sons upon Shawn's release would be in the children's best interests, and, in fact, all of the evidence before the court was to the contrary.[9]

_____

[9]    The court even asserted, based on its reading of a letter provided to the court by C.H.'s educational therapist, that the therapist had "adopted [Crystal's] party line," and that Crystal's "party line . . . doesn't lead to reunification." However, there was no evidence in the record that the therapist had any bias toward one parent over the other. The educational therapist informed the court that in "[their] last therapy session [C.H.] stated he did not want to have contact with his father," and suggested that "[i]t is very important to strongly consider the factors above when determining contact between [C.H.] and his father. [C.H.]'s consistent routines and stable environment should not be compromised otherwise regression, anxiety, and/or negative behaviors will develop." Despite the fact that there was no indication that this therapist had anything other than C.H.'s best interests in mind, the court disregarded the educational therapist's concerns.

2.       *The court's order minimizes the domestic abuse that Shawn perpetrated against Crystal, as well as its ramifications with respect to the children*

Our review of the record in this case indicates that the trial court failed to fully acknowledge the magnitude of the domestic violence that occurred in this case. As a result, the court repeatedly and improperly placed a great deal of the responsibility for the troubled relationship between Shawn and his children on Crystal.

As we have already discussed, Shawn was convicted of forcible oral copulation of his wife. He received a sentence of six years for this crime—not an insignificant sentence, which is an indication that the offense was a very serious one. In addition, there was abundant other credible evidence presented in the family court proceeding about other abusive conduct perpetrated by Shawn against Crystal. The evidence showed that the children were afraid of Shawn, with good reason. At a minimum, the tape recording of Shawn's conduct on the night of March 28, 2008, demonstrated considerable violence toward Crystal, and further demonstrated that the children were nearby when all of this was occurring. Moreover, C.H. indicated to Dr. Doyne that Shawn " 'smacked me and gave me a mark on my private parts,' " and said that Shawn had " 'hit me too and left awesome marks.' "

The trial court repeatedly minimized Shawn's abuse of Crystal as well as the effect of this abuse on the boys, despite the testimony of a neutral expert, appointed by the court, who made it clear that the domestic violence in this household had greatly affected the children. For example, at one hearing, the court said, "This father is not going to lose all visitation just because there w[ere] a couple of hours where he was on a different floor

28

in the house *doing something he shouldn't have done*." (Italics added.) Although Shawn had not yet been convicted of a felony with respect to his assault on Crystal at the time the court made this comment, the court had access to the tape recording of the incident, as well as "substantial independent corroboration" (§ 3011, subd. (b)(3)) of the abuse. The court's reference to the incident as Shawn "doing something he shouldn't have done" for "a couple of hours" suggests that the court minimized the severity of the domestic abuse in which Shawn engaged. Similarly, the court repeatedly discussed the fact that Shawn's violence had been directed at Crystal, not the boys.[10] In this regard, the court said,

> "But just because Mr. [H.] did bad things to her, doesn't mean that these kids lose their father. There are a lot of dads in prison who have done things worse than what Mr. [H.] did, who have an ongoing relationship with their children. And I do not believe that what Mr. [H.] did was directed toward the children. I think, obviously, there's some collateral damage. Any time that one parent does something bad to the other parent, there's collateral damage."

By referring to the damage that these children suffered as a result of the domestic violence that occurred in this home as "collateral damage," and by suggesting that Shawn's conduct could have been worse, the court again minimized the extent of the domestic violence in this case and its impact on the children. Dr. Doyne testified that "emotional harm has longer-lasting [e]ffects than physical harm in terms of . . . family violence," and repeatedly indicated that the children had been emotionally harmed by Shawn's violence toward their mother and could potentially be emotionally harmed upon

---

[10] In repeatedly referring to the abuse as being directed at Crystal, the trial court also apparently discounted Dr. Doyne's report of C.H.'s account of having been "smacked" and "hit" by Shawn, leaving "awesome" marks.

29

the reinitiation of contact with Shawn if he was not rehabilitated prior to that contact, even if the contact were to occur in a reunification therapy setting. The court appeared to disregard the evidence that these children had suffered direct harm as a result of Shawn's abuse of their mother, and instead believed that the only person who was substantially harmed by the abuse was Crystal, the person to whom the abuse was physically directed.

3. *The trial court improperly relied on ex parte discussions with an expert on parental alienation*

The trial court appears to have based its conclusion that it should not implement Dr. Doyne's recommendations at least in part on the court's ex parte discussions at a seminar with a psychologist who writes on the subject of parental alienation. This is particularly troubling. The trial court mentioned the work of Dr. Joan B. Kelly at least twice during these proceedings, despite the fact that she had not been identified as an expert in this case and was not subject to questioning by the parties' attorneys. Although the court stated that it was *not* relying on what the court had learned from Dr. Kelly at a seminar that the court attended, it seems clear from the totality of the court's statements, and the conclusions that the court ultimately reached in this case, that the court did, in fact, rely on Dr. Kelly's out-of-court comments about parental alienation when the court ordered that the reunification process between Shawn and the children must begin immediately upon Shawn's release from prison.

As the trial court acknowledged, when the court spoke with Dr. Kelly about the parental alienation theory during a luncheon at a seminar at which Dr. Kelly spoke regarding parental alienation, Dr. Kelly was speaking in general terms and did not have

30

any information about the facts of this case.  Nevertheless, the trial court appears to have relied on Dr. Kelly's comments when it fashioned its order regarding custody and visitation.  The court explained on the record exactly what the court had understood Dr. Kelly to have said in response to a question that the trial judge posed to her regarding what to do in a situation where a child "wants no part of the other parent":

> "And she said, 'What you don't do is you don't send that child to individual therapy and then allow the child and the therapist to determine when they want to reunite.'  She said, 'We have found that to be a total waste, it doesn't work.'  She said, 'What we have to do in that scenario is refer the kids or the kid and the parent to a family counselor or conjoint therapist.' "

Immediately after the trial court summarized what Dr. Kelly said should not occur in a case involving parental alienation, the trial court rejected Dr. Doyne's suggestions as to how to approach and structure visitation between Shawn and the children, saying, "So we're not going to do what Dr. Doyne is suggesting here."  The court disregarded Dr. Doyne's recommendation that reunification not be considered until Shawn had completed a 52-week domestic violence program and had participated in a year of individual psychotherapy, and that the children be assessed at that time with respect to their readiness to reunify with Shawn.  The court instead mandated that reunification occur, and ordered that it would take place as soon as possible after Shawn's release from custody, prior to his completing a domestic violence program or individual therapy.

The court made a logically flawed assumption in presuming that Dr. Kelly's views on parental alienation could be applied to a situation in which the parent with whom the children wanted nothing to do had been convicted of a felony and sentenced to six years

31

in prison for his domestic abuse of the children's other parent.  In Dr. Kelly's formulation of a theory of parental alienation, which she and her writing colleague presented in the Family Court Review in 2001, she specifically differentiates between children who resist visitation with a parent as a result of alienation, and those who resist visitation with a parent for normal or realistic reasons, including a history of abuse:  "Children who are realistically estranged from one of their parents as a consequence of that parent's history of family violence, abuse, or neglect *need to be clearly distinguished* from alienated children . . . ."  (Kelly & Johnston, *The Alienated Child: A Reformulation of Parental Alienation Syndrome* (2001) 39 Fam. Ct. Rev. 249, 253, italics added.)  The authors added, "It is important to note that children do not have to be direct witnesses to violence [to be realistically estranged from a parent]; the child need only see the aftermath of the violence or be left in the care of a victim parent who is traumatized by severe marital abuse.  And children also can be traumatized by an act of violence that from an adult's perspective might not have been very serious or injurious." (*Ibid*.)  It thus appears that the trial court did *not* differentiate between the cause of the estrangement in this case (i.e., Shawn's history of domestic abuse), and the unfounded bases for estrangement in a true case of parental alienation, despite the fact that Dr. Kelly clearly makes such a distinction in her writing on this topic.

Beyond this, the trial court erred in attempting to apply Dr. Kelly's comments about how to handle a case of parental alienation, given that Dr. Kelly was not named as an expert in this case, and given that Crystal's attorney had no opportunity to cross-examine Dr. Kelly or inquire of her whether her alienation theory would even apply in a

situation such as the one in this case. It was improper for the court to reject the recommendations of Dr. Doyne, an expert who knew the facts of this case, had interviewed the parties involved, and had been subjected to examination by both Shawn's and Crystal's attorneys, on the basis of the court's understanding of Dr. Kelly's general thoughts about parental alienation.

The evidence demonstrated that it was *Shawn's own behavior*, and not anything that Crystal said to the boys, that resulted in C.H. being afraid of Shawn and that caused both boys to harbor anger toward him. Specifically, C.H. told Dr. Doyne that Shawn had been "physically abusive to him and his mother." Dr. Doyne indicated that C.H. had told Dr. Doyne about the incident during which Shawn poked Crystal's throat, choking her, and that during this incident, C.H. felt " 'really mad and tried to get him to stop.' " C.H. also said that he felt " 'mad because I didn't want him to hurt my mom.' " It does not seem unreasonable that a child who has witnessed domestic violence would be fearful of, and angry at, the parent who committed that violence. W.H. also independently indicated to Dr. Doyne that he was aware of the domestic violence in the home. Interestingly, when Dr. Doyne asked W.H. how he thought his mother felt about Shawn, W.H. did not indicate that he believed Crystal harbored emotions as negative as those W.H. himself harbored, instead telling Dr. Doyne that he thought Crystal simply did not want to see Shawn again.

Despite all of the indications that these children feared and/or were angry with their father as a result of their father's own behavior, both toward them and their mother, throughout these proceedings the court repeatedly expressed concern that Crystal might

33

"alienate" her children from their father. The court did not appear to fully appreciate the possibility that these children were alienated from their father as a result of *his own* conduct and behavior. This, together with the court's minimization of Shawn's violence toward Crystal and its effect on the children, resulted in the court ultimately rejecting Dr. Doyne's recommendations, despite having expressed the view a few months earlier that these same recommendations "seemed to make a lot of sense," and adopting them as the court's tentative order.

4.　　*The trial court improperly considered the effect of its order from Shawn's perspective, and not solely on what would be in the children's best interests*

It appears from the record that in ordering that the reunification process between Shawn and his children begin immediately upon Shawn's release from prison, the court was considering what would be in *Shawn*'s interest, and not the children's. During various proceedings, the court expressed concern with the possibility that its orders might effectively "terminate" Shawn's parental rights by preventing him from seeing his children. At an early hearing, the court said, "This father is not going to lose all visitation just because there w[ere] a couple of hours where he was on a different floor in the house doing something he shouldn't have done." At another point, the court stated, "[E]ven if he did what he's accused of doing, in my mind that does not forfeit his right and the children's right to have a dad forever and ever."[11] The court even commented that

---

[11]　　The court's focus on the effect of its custody order on Shawn, as opposed to the children, is further evidenced by other statements by the court, such as at the conclusion of the trial, when the court stated, "But do we conclude necessarily that he was this bad dad, so that he shouldn't have any contact with the kids for years and years and years?"

reunification between the children and Shawn "would be in the best interest of the kids, and *it will certainly be in dad's best interest*." (Italics added.) At another point in the proceedings, the court's comments reflected what appears to be a concern that it would be effectuating a termination of Shawn's parental rights if the court did not order reunification.[12] The court's focus in these proceedings should have been on what was in the children's best interests only, and not on what the effect would be on Shawn's relationship with his children, from Shawn's perspective.

The court criticized Dr. Doyne's report because Dr. Doyne suggested that Shawn participate in a 52-week domestic violence program and undergo a year of therapy after his release from prison prior to having contact with the children. According to the court, this would mean that "he's essentially decided that Mr. [H.]' sentence should be a year longer." Again, the question before the court was not whether Shawn would be additionally penalized by the proposed visitation plan presented by Dr. Doyne, but rather, whether the plan that Dr. Doyne put forward would be in the children's best interests, regardless of what that meant for Shawn. By repeatedly considering the issue from the perspective of the impact on *Shawn*, while at the same time disregarding its own appointed expert's opinions concerning the potential negative impact on the children if

---

[12] When the court was considering whether the restraining order should remain in effect as to the children, the court commented, "But to take this next step would be extraordinary, because what it in effect would be doing would be terminating dad's parental rights, because you have already got sole physical custody and you['ve] already got sole legal custody. And if we were to say he couldn't even contact his kids or the kids, if they want to, couldn't contact him, he is no longer the father. You cut him out completely."

they were required to reunify with Shawn before they were ready to do so, the court failed to properly consider the best interests of the children.

It is possible that Shawn will eventually have a relationship with his sons that involves in-person visitation. However, how and when that may occur is a subject that is appropriately left for the court to determine closer to the time of Shawn's release from prison, and *after* the court assesses what type and amount of contact between Shawn and the children, if any, would be in the children's best interests *at that point in time*.

We therefore reverse that portion of the court's judgment identified in section C of the Order, titled "Reunification."

IV.

DISPOSITION

The judgment of the court in the dissolution action is reversed insofar as it requires immediate "reunification" between Shawn and C.H. and W.H., upon Shawn's release from prison.[13]  In all other respects the judgment is affirmed.  The court shall assess what would be in these children's best interests with respect to their relationship with Shawn closer to the time that Shawn is to be released from prison, and after a full consideration of the children's best interests at that point in time.  Crystal is awarded costs on appeal.

—————————————————

AARON, J.

I CONCUR:

—————————————————

McDONALD, Acting P. J.

—————————————————

13    Specifically, we reverse the court's orders identified in paragraphs 8, 9, 10, and 11 of the Order, which is incorporated into the judgment.

McINTYRE, J.

I concur in the disposition of this appeal.  I write separately because the majority opinion focuses, unnecessarily in my view, on details leading up to the challenged order. I believe this is an instance when less is more.

_____

McINTYRE, J.