[No. A105577. First Dist., Div. Four. Aug. 26, 2004.]

In re the Marriage of CHERI D. and KEITH W. MELVILLE.
CHERI D. MELVILLE, Appellant, v.
KEITH W. MELVILLE, Respondent.

## COUNSEL

Tarkington, O'Neill, Barrack & Chong, Robert A. Roth; Law Offices of Ann Riley and Ann Riley for Appellant.

Keith W. Melville, in pro. per., for Respondent.

## OPINION

**KAY, P. J.**—Appeal from a custody order in a marital dissolution. We affirm.

## BACKGROUND

The parties herein, the former wife and husband, refer to themselves in their briefs as Cheri and Keith, respectively. They also refer to their two sons by their first names, Devin and Patrick. We too will use these designations, intending no lack of respect to anyone.

The parties were married in 1981 and separated in 1994. At the time of separation, the family's residence was in San Mateo, although for most of the marriage they lived in San Diego. Following the separation, Keith moved to San Diego and subsequently remarried. Cheri, who continued living in San Mateo, had primary physical custody of both children after 1995. Patrick generally stayed with Keith during the summer.

In late 2001, Keith requested that he be given full custody of Patrick, who has Down's syndrome and a heart condition. Pursuant to court order, a

custody evaluation of Patrick was performed by psychologist Matthew Sullivan. In May of 2002, the parties accepted Dr. Sullivan's recommendations, which were embodied in a detailed order specifying physical custody and visitation. Keith and Cheri would share legal custody of Patrick. The order also provided: "The parent who Patrick resides with during the designated period below shall have the decision-making authority about Patrick's educational needs and day-to-day routine health care while he is in their physical custody. That parent shall share [and] discuss in a timely fashion with the other parent prior to making any such decisions for Patrick."

In December of 2002, Cheri was laid off from her job at America Online (AOL). The next day she told Keith that she planned to relocate and take Patrick to Klamath Falls, Oregon, where she had bought a house in 2000, and begin work as a mortgage broker. Keith obtained an order barring any change of Patrick's residence pending a court hearing for a modification of Patrick's custody due to this change of circumstance. Cheri violated that order by taking Patrick to Oregon. The court made a second order giving Keith "immediate, temporary custody" of Patrick pending further evaluation by Dr. Sullivan and the hearing. This court summarily denied Cheri's petition to have these orders set aside. (*Melville v. Superior Court* (Apr. 10, 2003, A102041) [summary denial by order].) Following our denial, the trial court made another order that "Patrick will reside primarily with Father subject to Mother's visitation."

At the time of the full hearing, Cheri had sold the home in San Mateo and to all intents and purposes lived in Klamath Falls. The hearing required two days; the court heard testimony from Keith, Dr. Sullivan, another psychologist, a physician, and Cheri. The court issued a comprehensive 25-page statement of decision that formed the basis for an order filed on December 30, 2003. Although a number of issues were addressed by the trial court, the only one at issue here is the matter of Patrick's custody. The court determined that Cheri and Keith would share legal custody, and that Keith would continue to have the majority of physical custody; Cheri would have custody during the summer, with regular visitation during the rest of the year. Cheri filed a timely notice of appeal from the order.

## REVIEW

### I

We do not summarize the testimony and evidence received by the trial court because Cheri does not attack the court's findings except upon grounds of bias and misapplication of law. We therefore take those findings as supported by substantial evidence. (E.g., *In re Marriage of Fink* (1979) 25

Cal.3d 877, 887 [160 Cal.Rptr. 516, 603 P.2d 881].) Before proceeding to examine the alleged legal deficiencies as identified by Cheri, we believe it useful to examine the trial court's detailed findings, using the trial court's headings.

**"Which parent is Patrick primarily bonded with?** [¶] Patrick has substantial parental bonds with both his parents. However, as stated by Dr. Sullivan's first report of May 2002, Patrick's primary bond has been with Cheri. Of further significance, Dr. Sullivan noted that Patrick is also very attached to his older brother, Devin, now 19, and from testimony at trial, Patrick is also attached to his two younger step-sisters who reside in Keith's home."

**"Which parent is best prepared to protect Patrick's health, safety and welfare, in light of the child's Down['s] Syndrome condition and his long-term needs?"** The court found that Cheri previously had a superior knowledge of Patrick's "educational, medical and services needs," but since Keith had primary custody he had competently provided for his son's special needs. The court concluded that "both parents are prepared to meet those needs."

**"What weight should the Court assign to Patrick's stated preference for the custodial arrangement?"** Although Patrick had repeatedly stated a preference for living with Cheri, the court decided to give this "little weight" because "Patrick, as a thirteen year old with a disability may be capable of stating his preference but is found not to have the capability to make an informed decision like this, weighing all of the factors and considerations involved."

**"Did Cheri reasonably facilitate Keith's visitation with Patrick during the nine years from separation to the January 10, 2003 ex parte order?** [¶] . . . Cheri claims that there were only two incidents identified by Keith alleging 'inappropriate denial of visitation', October 2001 and September 2002. The Court disagrees with Cheri's position." The court apparently accepted "allegations made by Keith pointing to how difficult it has been at times throughout the years to keep the visitation going." After examining "difficulties" advanced by Cheri and finding them unpersuasive, the court concluded that "Cheri's own testimony gave the Court the sense that Cheri is only willing to allow court ordered visitation that she absolutely must and was not and is not willing to facilitate anymore than that. This type of conduct is not reasonable and not in Patrick's best interest."

**"Did either parent interfere with the other parent's visitation rights during the months since the January 20, 2003 ex parte order?"** Although

chiding both parents for their "suspicion and conflict," only Cheri was found to have "failed to facilitate appropriate contact between Keith and Patrick during the time Patrick was returned to her custody."

**"Was Cheri's move to Oregon made in good faith**? [¶] . . . [¶] Cheri wants the Court to find that her move to Oregon 'was made in good faith for bona fide legitimate reasons'. The Court cannot make such findings based on the reasons she gave. There is no doubt that her reasons included the fact that she already had a home in Klamath Falls, and that she has an affection for that community and that there is a lower cost of living. However, the reasons behind the move, a job offer and Cheri's desire to have less work so she could spend more time with Patrick, are suspect." The court found "not credible" Cheri's claim that she only began thinking of moving after she was terminated from her position as vice-president at AOL. "[S]ometime during the prior school year she apparently contacted the school in Klamath Fall[s] and left the school officials with the impression that she had every intention of moving up to Oregon soon . . . . [¶] . . . [¶] Cheri further testified that she did not receive notice of her termination until December 11, 2002. This was five days **after** [a letter between Klamath Falls school employees mentioning Cheri talking about moving in 2002] . . . . [¶] . . . Cheri knew that she [was] leaving the company before December 11.

"To show that a move is made in good faith, in a case such as this where the hardships on the child must be balanced with the benefits, Cheri would have to show that she attempted to find other employment and she had little option but to move. . . . [¶] Some time well *before* her lay off, she began taking classes to become a mortgage broker. Sheri [*sic*] never testified that she ever intended to use her brokers license here in San Mateo County. Again, her actions, taking classes in a completely different field before she supposedly knew of any lay off, and no evidence presented in court of the specific attempts she made to find a job in her field here in San Mateo County, or her attempts to find work as a mortgage broker here, lead the court to find her testimony and declarations regarding her attempts to find employment here not credible.

"The Court will also point out, that Cheri argued that her AOL job allowed her the freedom to be with Patrick unlike a typical 9-5 job, or as she stated, a lower level job. Therefore, she felt being a mortgage broker would give her the same amount of flexibility, to be there for Patrick, for example, after school. However, these statements are again a misrepresentation of how much time she was actually 'there' for Patrick. Dr. Sullivan made a finding in his May 2002 evaluation that 'she has a demanding job that reduces her availability to directly care for Patrick. This requires child care support for Patrick, both after school and intermittently overnights, both during the week

and occasionally on weekends.' Her statements that she had to move to be able to provide Patrick the same quality of life she provided while working at AOL are disingenuous.

"Cheri's actions in connection with the move are more indicative of secretive plotting and scheming than the actions of someone suddenly laid off without any notice. The move was not made in good faith and not in Patrick's best interest, but made in Cheri's best interest."

**"Will Klamath Falls and/or San Diego meet Patrick's needs for a permanent custodial setting?** [¶] The households, communities and services of Klamath Falls and San Diego may each have their individual advantages and disadvantages, size of the communities and availability of services, for example. Keith has previously raised a concern regarding whether Patrick's health needs can be met in Klamath Falls. When Patrick was a toddler he had a significant heart condition that was treated while the parties lived in San Diego. Keith has regularly scheduled annual checkups with a San Diego heart specialist and, apparently, Patrick has not had any further heart problems. Cheri testified that she believed Patrick's medical needs would be met in Klamath Falls or in Medford, 70 miles from Klamath Falls. The Court does have concerns regarding the reality of Patrick's needs being met in Klamath Falls. If his needs cannot be met there, Medford may be too far in an emergency situation.

"Keith's household features greater contact with Keith, his wife Judy, who has been involved with Patrick and has been helping address Patrick's care, Patrick's older brother Devin, and Patrick's step-siblings. In Klamath Falls, Patrick would be with his mother. Cheri claims Patrick is comfortable in Klamath Falls, but he has only really visited there, and has no history of any extended stays.

"Both communities apparently have schools which have programs suited to Patrick. Patrick at this time is very familiar with the school in San Diego. . . . All the evidence suggests that Patrick has transitioned quite well to the school in San Diego. There was no evidence presented that brings doubt to the ability of the San Diego schools to provide for a child with Down['s] Syndrome.

"On the other hand, apparently Patrick had a lot of difficulty transitioning to the school in Klamath Falls. It is clear that he did not attend for more than just a few days, and that would not be enough time for someone like Patrick, who has difficulty adjusting to change, to feel comfortable. But the school and its personnel may not have the experience or ability to deal with Patrick. . . . The Court does have a serious concern that, although the school

in Klamath Falls does claim to be able to provide education to special needs children, being a town of only 20,000, they do not have requisite experience of providing for a child with Down['s] Syndrome.

"Based on the evidence presented, the Court . . . [finds] . . . that the households, community and services, including the school system in San Diego will meet Patrick's needs, and that there was not enough evidence presented to make an adequate showing that the household, community or services in Klamath Falls will meet his needs as efficiently and completely as San Diego."

**"Which parent should have primary physical custody of Patrick?"** The court began its extended discussion by considering Dr. Sullivan's conclusion in the May 2002 evaluation. "It is this Court's opinion that Dr. Sullivan ultimately favored Cheri's home for Patrick's school year because of primarily three strengths: [¶] 1) Cheri had provided primary parenting to Patrick and thus been much more involved in the educational and health services; [¶] 2) Cheri had 'lived in the community for nearly all of Patrick's life, creating continuity and familiarity that is essential to support Patrick's functioning'. Further, Dr. Sullivan wrote, 'Patrick has received special education services since his infancy in San Mateo. The continuity of Patrick's experience in this system is a critical positive factor in Patrick's life.' (emphasis added by Court); [¶] 3) Patrick's relationship with his babysitter and brother; 'she (Tara Hazelwood) was clearly more than just a 'babysitter' and 'Devin, who is nearly 18 years old is also a mature, responsible and caring brother for Patrick and an important support for Patrick in Cheri's home'. [¶] The bulk of Dr. Sullivan's findings really stressed the importance of what the community, San Mateo, had provided to Patrick and would continue to provide. [¶] . . . [¶] Over the next seven months, after arguing to keep Patrick in her custody for those same reasons Dr. Sullivan cites in his report, Cheri removed Patrick from the community that Dr. Sullivan believed was so important to Patrick and removed Devin from Patrick's life, in a way that couldn't have been any more devastating for both boys."

The court then discussed the specifics of the "devastating" removal of Devin: "On or about October 16, 2002, Cheri and Devin talked and it was decided that he would move to Keith's house. He called Keith that night and it was decided that he would go to San Diego two weeks later, after giving notice to his employer . . . . [¶] For some unknown reason, that night, after Devin was asleep, Cheri packed up his belongings, woke Devin at 5:00 am and immediately drove him to Keith's home in San Diego (with no advance notice to Keith). Devin never had an opportunity to give notice to his employer. . . . But even more importantly, Devin and Patrick NEVER had an opportunity to say good-bye." The court called what Cheri did to Devin "a form of abandonment."

Before addressing "Cheri's decision to move" and "Cheri's decisions regarding Patrick since January 2003" the court made this observation: "Cheri has stated that the Court is applying a 'double-standard' to the parties' right to move. Keith was able to move to San Diego, why shouldn't she be allowed to move wherever she would like. She stated in her objections to the Tentative Decision, 'Cheri had no duty to remain there' (San Mateo). Cheri misses the point. Dr. Sullivan recommended after the first evaluation that Patrick should live primarily with Cheri because of the support system and continuity of that system in San Mateo. Since it was that factor that tipped the scale in her favor as far as Dr. Sullivan was concerned, she did have a duty to stay here, or at least, discuss the potential move fully with Patrick's father and, perhaps, Dr. Sullivan before moving, which she did not. Lastly, Keith's move occurred many years ago under different circumstances and should not be compared to the present case."

The court found it "very disturbing" that Cheri did not broach the subject of moving to Oregon until "after she contacted the schools, listed her home [for sale], and had been studying for a new career. . . . [¶] . . . Cheri seems to fail to see . . . that she had made major decisions regarding significant changes in Patrick's life unilaterally . . . without any acknowledgment of the impact on Patrick being moved away from his school, his teachers, his friends, and farther from his father and brother and step-family when she should have known the likely impact on Patrick based on the findings of Dr. Sullivan." One particular impact of a move to Oregon would be that it would complicate, and possibly curtail, Patrick's visitation with Keith.

With respect to "Cheri's decisions regarding Patrick since January 2003," the trial court found: "After Keith filed his ex parte motion in January 2003, primary custody of Patrick was awarded to him. Keith promptly enrolled Patrick in school. Cheri filed a writ with the Court of Appeal. Pending the ruling from the Court of Appeal, primary custody of Patrick was returned to her on or about March 25. However, she was still under an order not to remove Patrick from the State of California. She knew she could not return to Klamath Falls, Oregon, until after the trial on Keith's motion to change custody. Instead of finding temporary housing in San Diego so that Patrick could continue to attend the school he had attended for over two months, Cheri chose to find temporary housing in Tule Lake, California, a place as close to the Oregon border one could get. During the time Patrick was in Cheri's custody in Tule Lake, Patrick did not attend school. This relocation was yet another transition for Patrick, a boy who does not handle transitions well. [¶] The Court did not hear any testimony justifying the move to Tule Lake. There was no testimony that the decision was made for economic reasons. There was a cost associated with relocating [to] Tule Lake as there would have been a cost associated with Cheri relocating [to] San Diego on a temporary basis. It clearly was not a decision made in Patrick's best interest.

He had to deal with a third relocation in as many months and could not attend school. But it got Cheri as close as she could get to Klamath Falls. [Fn. omitted.]"

In a related vein, the court continued: "Patrick has endured many transitions since the end of December 2002 through April 2003. It is in Patrick's best interest that the Court attempt to limit further changes and transitions for Patrick. [¶] He is now settled in San Diego. He is very familiar with his surroundings, his home, his family and his school . . . . On the other hand, he is familiar with Klamath Falls, having spent vacation time there and his mother and her friend 'Rick' are there. It is undisputed, however, that he hadn't transitioned well to the school there, having only been there a couple of days."

The court's conclusion was as follows: "While Dr. Sullivan found both parents to be capable of meeting Patrick's special needs, and overall be competent parents, the Court cannot overlook the poor judgment calls made by Cheri during the past year. While all parents make sacrifices when it comes to caring for their children, sometimes parents of children with special needs may be called upon to make many sacrifices. The Court understands Cheri's dilemma when faced with the possibility of losing her job, but the Court does not agree with her course of action. Keith and Cheri had the benefit of the expert insight of Dr. Sullivan. Cheri obtained the order she wanted in May 2002, and then apparently quickly forgot or chose to ignore everything Dr. Sullivan wrote about what Patrick needed from his parents. She chose instead to make decisions that would benefit her. Because of Cheri's actions since May 2002, including the alarming way she handled, and continues to handle, her issues with Devin, because Patrick is settled in San Diego, and Keith is the parent at this time better suited to meet Patrick's needs, including those of a 13 year old boy with special needs at times perhaps requiring a father's attention, the Court will not cause any further transitions for Patrick and finds that Patrick will live primarily with Keith during the school years. The Court shall adopt the recommendations of Dr. Sullivan from February 2003. Keith will be the 'designate parent' . . . [for the school year] and Cheri will be the designate parent . . . [for the summer]."

## II

The trial court's order is reviewed for abuse of discretion; reversal is warranted only if there is no reasonable basis upon which the trial court could conclude that its decision advanced the best interests of the child. (E.g., *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 [51 Cal.Rptr.2d 444, 913 P.2d 473]; *In re Marriage of Bryant* (2001) 91 Cal.App.4th 789, 793 [110 Cal.Rptr.2d 791].)

█ "A parent entitled to the custody of a child has a right to change the residence of the child, subject to the power of the court to restrain a removal that would prejudice the rights or welfare of the child." (Fam. Code, § 7501, subd. (a).) What this principle means in application is that a custodial parent seeking to move is not obliged to establish a need or even a justification for the move, so long as it will not be detrimental or prejudicial to the child's interests. (*In re Marriage of Burgess, supra,* 13 Cal.4th 25, 32, 34, 37–38; *In re Marriage of Campos* (2003) 108 Cal.App.4th 839, 843 [134 Cal.Rptr.2d 300]; *In re Marriage of Bryant, supra,* 91 Cal.App.4th 789, 793.) "[T]he paramount need for continuity and stability in custody arrangements—and the harm that may result from disruption of established patterns of care and emotional bonds . . . weigh heavily in favor of maintaining ongoing custody arrangements." (*In re Marriage of Burgess, supra,* at pp. 32–33.) The emphasis is not on the parents, but on the child. The trial court " 'should preserve the established mode of custody *unless some significant change in circumstance indicates that a different arrangement would be in the child's best interest.*' [Citation.]" (*Id.* at p. 38, italics added.)

The caption of the sole contention made in Cheri's brief reads: "The court's improper enmity toward Cheri for her decision to relocate was prejudicial error requiring reversal of the custody order." She argues that "The Statement of Decision makes inescapably clear that the court's disapproval of Cheri's decision to move had a profound and pivotal effect on its decision that Cheri should not be granted custody despite over nine years as Patrick's primary caregiver. [¶] . . . [¶] [The court's] antipathy toward Cheri requires reversal because it stems from the court's misplaced second-guessing of Cheri's reasons for moving and goes to the heart of the court's principal reasons for determining that Keith would be a better custodial parent."

█ It may be conceded that some of the court's language might have been more diplomatically expressed, but there is no basis for discerning "enmity" or "antipathy." A parent's move is in effect presumed to be in good faith unless it is shown to have an improper motive—such as impairing visitation with the other parent—or will have an adverse effect on the child. (See *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072, 1098–1099 [12 Cal.Rptr.3d 356, 88 P.3d 81]; *In re Marriage of Burgess, supra,* 13 Cal.4th 25, 32, 36, fn. 5.) As is clear from the court's statement of decision, it was Cheri who requested the court to make the determination whether her move was in good faith.

The court also concluded that Cheri "should have known the likely impact on Patrick" if they moved. From this and other findings, it is clear that the court determined that relocating to Oregon would cause detriment to Patrick. This finding alone, supported by substantial evidence, requires affirmance.

(Fam. Code, § 7501, subd. (a).) It is this finding of detriment, and not the question of good faith or bad faith, that is dispositive.

Our Supreme Court recently held that "just as a custodial parent does not have to establish that a planned move is 'necessary,' neither does the noncustodial parent have to establish that a change of custody is 'essential' to prevent detriment to the children from the planned move. Rather, the noncustodial parent bears the initial burden of showing that the proposed relocation of the children's residence would cause detriment to the children, requiring a reevaluation of the children's custody. The likely impact of the proposed move on the noncustodial parent's relationship with the children is a relevant factor in determining whether the move would cause detriment to the children and, when considered in light of all the relevant factors, may be sufficient to justify a change in custody. If the noncustodial parent makes such an initial showing of detriment, the court must perform the delicate and difficult task of determining whether a change in custody is in the best interests of the children." (*In re Marriage of LaMusga, supra,* 32 Cal.4th 1072, 1078.) Although the trial court did not have the benefit of this latest opinion when it had to make its decision, the reasoning behind the order is fully compatible with these principles. There is also no basis for appellant arguing that the court did not adhere to the standards of *In re Marriage of Burgess, supra,* 13 Cal.4th 25.

Keith presented ample evidence that Cheri's move to Oregon constituted a material change in circumstances warranting modification of the existing custody order. If Patrick spent the majority of his time in Klamath Falls he would lose the presumably adequate educational opportunities and, if needed, access to medical care in San Diego. Patrick had not "transitioned well to the school" in Klamath Falls, "having only been there a couple of days." Moving him back there from San Diego would only disturb a child with an "inability to transition well" to new surroundings. As between Klamath Falls and San Diego, the trial court concluded that the former would not "meet his needs as efficiently and completely as San Diego." Whereas Devin used to live with Patrick in San Mateo, Devin would not be near Patrick in Klamath Falls but he would in San Diego. Patrick knows San Diego but would be a virtual stranger to Klamath Falls. Cheri is therefore simply wrong in arguing the trial court "identif[ied] no substantial detriment that would result from the move." If Patrick's needs were the most important consideration, Cheri did have a "duty" to stay in San Mateo, as opposed to moving to Klamath Falls, where those needs would not be so well served. Cheri is correct that she had "an unquestioned right to relocate to Oregon," but that does not affect the court's obligation to consider the consequences of that move to Patrick. As the trial court pointed out, the "support system" Patrick had in San Mateo was the decisive factor in the previous decision to award primary custody to Cheri.

■ In light of the paramount need for stability and continuity for Patrick, the court's findings demonstrate a substantial basis for the order that Keith have primary custody. That order was made only after the court heard more than 500 pages of testimony and argument. The court's statement of decision was quoted at length to show the breadth of the court's inquiry and the painstaking analysis undertaken. We find no abuse of discretion. (*In re Marriage of Burgess, supra,* 13 Cal.4th 25, 32.)

The order is affirmed.

Reardon, J., and Rivera, J., concurred.

A petition for a rehearing was denied September 9, 2004, and appellant's petition for review by the Supreme Court was denied December 15, 2004.