Filed 4/29/26  Cosenza v. Northey CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CORY EDWARDS COSENZA, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> KENDRA DAWN NORTHEY, <br><br> Defendant and Appellant. | F089590 <br><br> (Super. Ct. No. 19FL-0587) <br><br><br> **OPINION** |

THE COURT*

APPEAL from a judgment of the Superior Court of Kings County.  Mark Skinner, Judge.

Law Office of John C. Umscheid and John C. Umscheid, for Defendant and Appellant.

Maroot, Hardcastle & Jolly and Timothy W. Jolly, for Plaintiff and Respondent.

-ooOoo-

---

*       Before Franson, Acting P. J., Meehan, J. and DeSantos, J.

In this family law matter, Kendra Northey and Cory Cosenza litigated the issue of legal and physical custody of their minor daughter K.C., as well as the issue of whether K.C. would start kindergarten and attend school in Clovis (Fresno County), where Northey lived, or in the Hanford-Lemoore area (Kings County), where Cosenza lived. After a court trial, the family court awarded sole legal and physical custody to Cosenza and ordered that K.C. attend school in Kings County. The court ordered that K.C. would spend alternate weekends with Northey. Northey appealed. We affirm.

<u>**FACTS AND PROCEDURAL HISTORY**</u>

*General Background*

Cosenza (father) and Northey (mother) met in 2018. K.C. was born in July 2019. At the time, Cosenza and Northey were living with Cosenza's mother, Marsha Farrell, in Hanford. In November 2019, Northey moved out of Farrell's home and relocated to her parents' house in Clovis. Shortly thereafter, sometime in 2020, Northey moved back in with Farrell and Cosenza. She stayed for a period "[b]etween six and seven months," before relocating to her parents' house again in January 2021.

Since that time, Northey has continued to live with her parents in Clovis. As for Cosenza, he has moved a few times since 2021, but has remained in the Hanford area. Cosenza has been in a relationship with April G. (April) since approximately 2021; they are not married. Cosenza and April live together, along with April's two young sons.

Cosenza initiated the instant child custody case in the Kings County Superior Court on October 18, 2019, when he and Northey were living at Farrell's house in Hanford after K.C.'s birth. Cosenza explained, at a subsequent hearing, his rationale for doing so: "[Northey] always threatened to leave and take [K.C.] with her, and so I wanted to get that taken care of with the orders so that way if she did ever leave I would have custody of or joint custody of [K.C.]" Cosenza's initiation of the case led Northey to move out of Farrell's house the first time around.

2.

The clerk's transcript—which is very sparse and basically consists of the register of actions in the matter[1]—indicates that the family court issued various custody orders since the case was initiated. It appears a custody order was filed on February 18, 2020, specifying joint legal and joint physical custody, with a 2-2-3 time sharing schedule. The order was subsequently modified after a hearing held on March 29, 2022; the modified order was filed on July 15, 2022.[2]

Like the family court's prior order, the July 15, 2022 order also provided for joint legal custody and joint physical custody, with equal time shares on a 2-2-3 schedule. However, the July 15, 2022 order qualified the award of joint legal custody with respect to the child's medical care. Specifically, the order awarded Cosenza sole authority to make the final decision in any dispute concerning K.C.'s medical care.

The family court's July 15, 2022 order noted there was a high degree of contentiousness between the parents. The order indicated the court was seriously concerned about the parties' ongoing inability to co-parent amicably. In addition, the order emphasized improper behavior on Northey's part. Pursuant to the July 15, 2022 order, Northey completed a "co-parenting class," an "anger management class," and a "high conflict class." Thereafter, on May 10, 2024, the family court restored unqualified joint legal custody to both parents.

Under the parties' preexisting 2-2-3 custody schedule, when K.C. was with her mother, she attended a daycare/preschool facility in Fresno at which her mother worked. When she was with her father, she attended a different daycare/preschool facility in Hanford. This arrangement would no longer be feasible as of August 2024, when K.C. was due to start kindergarten.

---

[1] Aside from the register of actions, the clerk's transcript only contains the custody order filed on February 3, 2025, which is the subject of the instant appeal.

[2] Neither the February 18, 2020 order, nor the July 15, 2022 order, are in the record on appeal, but both are reflected on the register of actions.

3.

Given the impending question of where K.C. would enroll in kindergarten—Fresno County or Kings County—on March 5, 2024, *Northey* filed a request for order seeking sole legal custody and sole physical custody of K.C., with visitation for *Cosenza* on *alternate* weekends from Friday at 6:00 p.m. to Sunday at 6:00 p.m.  Northey requested that K.C. be allowed to enroll in kindergarten in Clovis in Fresno County, at an elementary school in the Clovis Unified School District.  As noted, Northey lived at her parents' house, which was in the Clovis Unified School District.

The record suggests while Northey's March 5, 2024 request for order was pending, K.C. started kindergarten in August 2024 at Akers Elementary School located on Naval Air Station Lemoore, pursuant to a temporary or interim court order from May 2024.[3]  The parents maintained the 2-2-3 time sharing arrangement even after K.C. started school, pending resolution of Northey's March 5, 2024 request for order.

Pursuant to a prior, longstanding court order, the parents would meet at the Selma police station to exchange K.C.  *During Northey's custodial periods*, Northey would leave home at 6:15 a.m. on school days to drive K.C. to the Selma police station (approximately a 30-minute drive); the exchange time was 7:00 a.m.  Usually, April (Cosenza's partner) would meet Northey there to collect K.C. and drive her to school on the air base in Lemoore, along with April's own two children.[4]  At the end of the day, April, Farrell, or Cosenza would drive K.C. to the Selma police station by 6:00 p.m. (the evening exchange time); Northey would collect K.C. from there and drive her to Northey's home in Clovis.  These were long and tiring days for K.C., with a lot of driving

---

[3]  The May 2024 order is not itself in the record on appeal; however, it is referred to in the reporter's transcript of the underlying trial.

[4]  April worked at Naval Air Station Lemoore and hence would drive the children to school on the base.

time.[5]  The status quo—that is, a 2-2-3 custody schedule—was not tenable in the long term, at least during the school year.

The family court eventually held a contested hearing or court trial on Northey's March 5, 2024 request for order.  The trial took place on October 18, 21, 24 and 25, 2024, and November 15, 2024.  Both parties were represented by counsel.

At the trial, Northey testified on her own behalf and called her mother and father as additional witnesses.  As for Cosenza, he testified on his own behalf and called his mother as an additional witness.  Both parties also questioned Edward Coronado, a Kings County Superior Court child custody recommending counselor, who conducted a child custody counseling session with the parties on May 23, 2024.  Coronado had prepared a report and recommendation based on his session with the parties; the report was filed with the court on July 8, 2024.  The report was admitted into evidence at trial *but is not in the record on appeal*.

***Trial Evidence:  Testimony of K.C.'s Parents and Family Members***

At the time of the underlying trial in this matter, Cosenza worked as a tow truck driver.  His partner, April, worked in some capacity at Naval Air Station Lemoore. Northey worked at a daycare/preschool facility in Fresno.

Although K.C. had started kindergarten at Akers Elementary, Cosenza and Northey did not independently have the right to access Naval Air Station Lemoore, and by extension, Akers Elementary.  Rather, they were able to access the base through April's sponsorship.  Cosenza testified that he had access to the base through April's sponsorship and that Northey had "the same base access" through April's sponsorship.

---

[5]  Northey's father testified that K.C.'s demeanor at the exchanges changed after she started kindergarten.  Specifically, he stated she seemed tired, given "[s]he's driving three hours a day back and forth."  He acknowledged, however, that her demeanor may well be different on the days she stayed with Cosenza in Hanford, which would not entail such long days for her.

Cosenza further testified that there was no obstacle to him and Northey maintaining their access to the base. Northey testified she had gone to the school on one occasion to pick K.C. up for an appointment, without any problem; there had not yet been any occasion when she needed access but was blocked. Northey also testified she had access to K.C.'s teachers through an app used by the school.[6] In addition, Northey testified that Cosenza usually informed her through the Talking Parents app when K.C. was picked up from school. The record indicates that Cosenza and Northey's base passes needed to be periodically renewed. Northey's base pass expired during the trial and was in the process of being renewed.

Cosenza had long workdays. While he was an involved father to K.C., he also relied on April's help in managing many tasks related to caring for K.C., including transporting her to and from school, taking her to medical appointments, and communicating with her school. Cosenza also handled such tasks himself, but April would assist when Cosenza had to work. In addition, Cosenza's mother helped with taking care of K.C. during the child's time in Cosenza's custody. Similarly, during Northey's custodial time with K.C., Northey's parents would assist her in caring for the child, as Northey had a fulltime job.[7] Northey was also an involved parent.

Northey and Northey's mother testified to a negative view of Cosenza's ability to provide a stable and healthy environment for K.C. As for Cosenza, he was asked whether he had "any issues with … how [Northey] treats [K.C.] in her care"; he responded "[n]ot often."

Northey acknowledged she and Cosenza had a contentious history in terms of making medical decisions for K.C., including over whether she needed speech therapy,

---

[6] Northey testified: "[K.C.'s] teachers are very nice. I have very good contact with them. But she has no relationship to any of the naval stuff."

[7] Northey's father and mother had jobs too; they worked as a water manager and medical assistant, respectively.

whether she needed allergy medication, and whether to give her Tylenol. Cosenza agreed that making medical decisions for K.C. was an area of friction. Northey testified that should Cosenza be awarded sole legal custody she did not believe "[K.C.] would be taken care of properly" and "would [not] be safe." Northey testified that K.C.'s immunizations were not up to date because Cosenza refused to make the necessary appointment. Cosenza disputed Northey's characterization and stated K.C.'s immunizations were up to date and introduced her immunization record into evidence. Northey testified that when the court had previously given Cosenza sole authority to make the final decision as to K.C.'s medical care, he did not collaborate with Northey or keep her fully informed.

The respective testimony of Northey and Northey's mother further reflected they had a particularly contentious relationship with April. Both Northey and Northey's mother testified about several negative interactions with April and about observing April physically pull K.C. away from Northey or being rigid with K.C. at exchanges. Northey also accused April of speeding and failing to observe flashing red lights at a railroad crossing, with K.C. in the car. Northey's father, who had regularly interacted with April and Cosenza at exchanges over several years, had a different perspective. He testified he had no problems with them; he stated: "They act very good with me."

Northey's counsel presented court documents (i.e., a criminal complaint and a minute order) showing that in 2018, April reached a plea deal regarding a violation of Penal Code section 273a, subdivision (b) (misdemeanor child endangerment/abuse), resulting in a sentence of probation; the family court took judicial notice of the documents. The documents at issue are not in the record on appeal and the record is devoid of any factual details regarding the conduct underlying the misdemeanor conviction. Nor does it appear, based on the court's description of the documents as reflected in the record, that they encompassed factual details of the underlying conduct. Northey testified that she had not brought up April's misdemeanor conviction to the

7.

court's attention in any prior proceeding. Cosenza testified, to the contrary, that the issue was raised in prior court proceedings.

Northey also testified that Cosenza had told her that he and April were married; however, shortly thereafter she discovered they were not married. She added Cosenza nonetheless continued subsequently to assert for some time that they were indeed married. Cosenza's mother testified that although Cosenza and April were not married, they had conducted a commitment ceremony.

Cosenza's mother further testified that shortly after Northey moved out of her house the first time and relocated to her parents' house in Clovis, Northey was physically attacked by her brother (this happened in 2020). Northey texted Cosenza's mother at the time to tell her about her brother's conduct; the text message in question was admitted into evidence (however, it is not in the record on appeal). This incident was the catalyst that prompted Northey to move back in with Cosenza and his mother. When Northey was asked about this incident, she acknowledged she had an altercation with her brother but noted her brother now "lives in his own house" about "45 minutes to 50 minutes away."

### Trial Evidence:  Testimony of Child Custody Recommending Counselor

Edward Coronado, a child custody recommending counselor (CCRC) at the family court, testified in this matter. The parties stipulated that Coronado was an expert in the area of child custody recommending counseling. Coronado conducted a child custody recommending counseling session with Cosenza and Northey jointly, on May 23, 2024.[8] The primary question was where K.C. would attend school. Coronado prepared a written

---

[8] Coronado informed the parties that should they agree to a custody plan, it would be submitted to the family court for approval; Coronado's role would be limited to making a recommendation on points where no agreement was reached. Coronado clarified that the final decision would be made by the court.

report and custody recommendation that was filed with the court on July 8, 2024, and subsequently admitted into evidence at trial.

Although Coronado's report is not in the record on appeal, the record reveals the parameters of his custody recommendation. Coronado recommended that K.C.'s best interests would be served by attending school in Kings County and an award of sole legal and physical custody to Cosenza. Coronado further recommended that K.C. reside with Northey on the first, third, and when applicable, fifth weekends of every month, from 6:00 p.m. on Friday until 6:00 p.m. on Sunday. Coronado testified his "recommendation was based on what [he] perceived to be the best interest of the child." Coronado acknowledged his recommendation was that the child spend more time in Cosenza's care than Cosenza had initially asked for (see below).

Coronado testified: "Mother's request was sole legal and physical custody of the child [with mother] and for the child to reside with father on alternate weekends from Friday at 6:00 p.m. until Sunday at 6:00 p.m." Coronado also testified: "[T]he mother stated she resided in Clovis, California in Fresno County. And reported that the education and the school would be superior or better than any of the schools in Kings County. So she was wanting to have her child reside with her primar[ily] so the child could attend the schools in Clovis Unified School District."

Coronado also described Cosenza's request: "[F]ather's request was to seek sole legal custody of the child [and share] joint physical custody of the child with the mother. The child would reside with the mother on the first, second, fourth and fifth weekend of each month. From Friday at 6:00 [p.m.] until … 7:00 p.m. on Sunday. During the summer[,] he proposed that the parents would share … alternate weeks with exchanging the child on Friday at 7:00 p.m."

Coronado confirmed Cosenza was offering joint physical custody as well as more time with Northey during the school year and in the summer than Northey was offering him. As for Cosenza's request for sole legal custody, Coronado added: "[T]he father

stated that he was seeking sole legal [custody] because he wanted to avoid having the challenge of having conflict and further disagreement with the mother." Cosenza had indicated there had been disagreements as to "the school where the child would attend and also issues with medical."

Both parties completed intake forms during the counseling session with Coronado. The forms showed that Northey did *not* allege any domestic violence on the part of Cosenza. Coronado stated that Cosenza indicated on his intake form that he was married. Cosenza further indicated he wanted K.C. to attend school at Akers Elementary on the naval air base in Lemoore.

Coronado's review of the case indicated a history of disagreement and conflict between the parents. Coronado indicated that during the counseling session, Northey noted she believed Cosenza did not attend to K.C.'s cleanliness or hygiene. Coronado further noted that Northey's tone during the counseling session was "angry and upset." He indicated, as reflected in his report, that Northey lost her temper and was unable to regain control until she had expressed every negative view she had of Cosenza. He further indicated that Northey continued to demonstrate outright anger and disrespect towards Cosenza. Coronado acknowledged that Northey's behavior during the counseling session was a major factor in his ultimate custody recommendation. He indicated, as reflected in his report, that the level of hostility demonstrated by Northey towards Cosenza militated in favor of an award of sole legal custody to Cosenza, based on the best interests of K.C.

Coronado explained in detail the reasoning underlying his recommendation that Cosenza be awarded sole legal custody. He stated:

> "The recommendation was for sole legal for father … because of the behavior that was manifested in the session. Mother … started to have a discussion with father [regarding] the reasons why … he's [an] unfit father [given] how the child was received from him to her. Including soiled and so on. Mother continued to explain and be starting to insult and belittle the

10.

father. I listened hop[ing] she can gather herself … [¶] What I found was the mother was very upset with the father and she … continued to berate and belittle him in the session. And uhm, that went on. When reviewing the case I saw that at one point there was a [temporary] restraining order for domestic violence … against the mother. Father was struck by the mother. Then [what] we saw in [the] session she was very upset and angry and started to belittle the father. Based on her request it appears that the father was more willing to share than the mother. The father did offer more … custodial time with the mother in his proposal. He's also proposing joint physical custody. So the reasoning behind the recommendation that I made was that … this parent was the willing party to share.

"And that there was some issue with the mother and her behavior, although on mother's behalf she did report that she completed an anger management class and also a parenting class. After she had finished speaking to the father I did ask the mother could she recall what was learned and discussed in the anger management class and she stated [a] couple [of] things of taking breaths. And then I asked her what she [did in] the co-parenting class. She made a statement about that. I asked that because I wanted to see if she was able to use any of the tools that were brought from the anger management class and the parenting class. And after what was manifested and then also knowing that in father's report he did report that there was domestic violence between the mother and him. Where as the mother did not report that there was domestic violence and then in court review we found that there was a temporary restraining order for a short amount of time against the mother. So based on all this assessment the recommendation was then made for what we have."

At another point in his testimony, Coronado reiterated this reasoning, stating: "If [the mother is] demonstrating hostile behavior [towards the father] in front of a person she just met for [a custody counseling] session … we don't know if she is demonstrating hostile behavior in front of the child when she's on the phone with the father or communicating with the father in person. So that's why the recommendation for sole legal custody was made. Because of the arguments regarding medical [care] and education." Coronado noted that when a parent models improper behavior to a child, there is a risk the child will begin to mimic it. Coronado also clarified that Cosenza did not exhibit any hostility towards Northey during the counseling session or exhibit other improper behavior.

11.

Coronado further testified, as also reflected in his report, that should Northey remain on the same course, there was a potential that agency-supervised visitation would be necessitated as to her, in the future. He explained: "Not necessarily now. But in [time] if whatever this Court orders with regard to custody and visitation[,] if … the parties were to refile and come back down to CCRC … that would be taken [into] consideration as a possible recommendation." He added: "But with this, [we] want the parties to know that the way they have been handling things cannot continue for the best interest of this child. This child would be exposed to further verbal abuse between the parties or the mom to the father and if the mother was able to express herself in [that] manner … in front of me at the CCRC session what happens at home one can only imagine."

Coronado continued: "[A]lthough I'm not there so I cannot say for sure, but if that happened in the Family Court Services then this is modeled behavior for a child. So that's why we don't want that. We don't want the agency to have supervised visits with the mother … this is possible if it continues and doesn't get better.… What's in the best interest for their child." As to this point, Coronado concluded: "The hope … with this recommendation is that the parties could reach a point where they can set aside the acrimony and work together to be coparents. That's what we want. That's what the whole goal is."

Coronado noted that the intake forms contained a question to the effect, "has anyone you lived with ever been arrested or convicted, [or] charged with a crime," which Cosenza had answered in the affirmative. Cosenza had further indicated that April had been involved in a criminal matter in Kings County, but it was eventually dropped. Coronado said he did not further investigate the information provided by Cosenza.

Northey's counsel then asked Coronado: "[W]ould you say further investigation [w]ould be needed before [your] recommendation [sh]ould be relied upon?" Coronado responded: "Not necessarily. Because as I stated the parties have had orders prior. And

12.

I didn't read [in] any of the prior orders that this was an issue." Coronado added: "What's at issue is the parents not [being] able to get along and the hostility that they have and the best interest in parenting the child. Now if it's a concern, that the father's partner … did a crime 5 [years ago] or whatever the timeframe, why is the mother still proposing the father have visitation if there's such a concern of who he lives with and how the child's exposed?" Coronado continued: "Why is it a concern now when even in [the mother's] proposal … she's still proposing the child goes to the father's house where this individual lives?" Coronado concluded, "That's not a concern [for her]."

**_Family Court's Post-hearing Custody Order_**

On February 3, 2025, the family court issued a detailed, written custody order. The court stated at the top of its order that in reaching its decision, it considered 13 documentary exhibits that were admitted into evidence at trial; none of the exhibits admitted into evidence at trial are in the record on appeal.

The family court adopted the custody recommendation of CCRC Coronado, concluding that K.C.'s "best interests are served by attending school in Kings County and an award of sole legal and physical custody to Father." Pursuant to the order, K.C. would "reside with Mother on the 1st, 3rd, and when applicable the 5th Friday of every month from 6:00 p.m. until Sunday at 6:00 p.m." The court's order added a provision to CCRC Coronado's recommendation "giving mother the right to authorize emergency medical care when the minor child is with her." We next summarize the court's detailed and thorough order.

In its post-hearing custody order, the family court began by delineating the prior custody orders of February 18, 2020, and July 15, 2022. With respect to the February 18, 2020 order, the court noted it was "a joint legal and joint physical order with substantially equal time spent with each parent," on "a 223 visitation schedule." The court stated: "The order also provides for a 'No Move Hold' and defines the primary home [as Farrell's home in] Hanford." The court added: "While the court is unsure what a 'no

13.

move hold' is intended to be, the court will find that the child has resided in Kings County primarily and spent a substantially equal time in Clovis (Fresno County) since Mother moved to Clovis."

The family court also took note of the modified custody order of July 15, 2022, which was necessitated because of ongoing "difficulty in sharing joint legal custody and managing the child's medical concerns." Under the July 15, 2022 order, "sole decision making authority [was] awarded to father regarding medical decisions." The court observed: "In considering the evidence[,] the court is mindful of both the circumstances that resulted in the July 15th order and the subsequent accomplishments of Mother that resulted in a restoration of joint legal custody," pursuant to a May 10, 2024 order.

As for physical custody, the family court pointed out: "The parties have operated under the 223 plan with amendments until present." The court observed: "[Essentially,] [t]he parents have been sharing a substantially equal time share while the child was not of school age. She is now at the age where she [needed] to be enrolled in school which triggered the need for a decision in this case." The court added: "This case is not a 'move away' case in the normative sense. The child is already well situated in both homes. The substantial change in circumstance in this case is the need to set a child sharing schedule that accommodates the child's need to attend compulsory education. The result will be that one parent's time with the child will be reduced in order to accommodate the child's educational needs in the coming years."

The family court further noted: "The court, in reviewing the file, does not find an express statement that a permanent order has been issued. It also appears from the file that there is substantial conflict that has not diminished, and the court has been continuously involved in administering the custody and visitation plan because the parties have demonstrated a consistent inability to self-manage their post separation relationship as well as the co-parenting relationship necessary to share custody."

14.

The family court observed: "In evaluating the best interest of the child[,] the court must examine the parties['] ability to share in parenting responsibilities. This is one of the aspects of the court's consideration of the best interests of the child. Family Code [section] 3020[, subdivision] (b) provides, in part, that 'it is the public policy of this state … to encourage parents to share the rights and responsibilities of child rearing.' "

Next, the family court summarized the evidence presented at trial. First, the court summarized CCRC Coronado's testimony as follows:

> "Mr. Coronado testified about his observations during the process of interviewing the parents. He indicated that Mother's behavior was concerning. Mother claimed Father was unfit as a parent, demonstrated that she was very upset and continued to berate and diminish Father. He described her affect as upset and angry in contrast to Father who did not demonstrate hostility. When asked if Mother raised her voice Mr. Coronado indicated she became clearly upset, her tone changed demonstrating her anger and upset. She lost control of her temper and was unable to regain control until she ran out of steam. Mr. Coronado further indicated that if conditions did not improve with Mother that supervision may be required. He further stated that this manner of handling temper cannot continue. He further opined that this conduct could impact the minor if mother does not change. In the report on page 6 of 10, Mr. Coronado opines, 'This counselor has taken into consideration the Mother's behavior, and if it does not improve, a recommendation of agency-supervised visits with the child may be considered.' "

The family court then addressed the testimony of Northey's mother, whom the court designated as the "Maternal Grand Mother" or "MGM." The court stated:

> "The court in hearing [MGM's] testimony, was concerned that [MGM] and her daughter are e[n]meshed. Mother lives in the MGM's home and the MGM often acts in the role of a primary parent toward the minor child. MGM and Mother are both hostile to Father and believe he is not capable of caring for the minor child. They both are hostile to Father[']s significant other[,] April [G.] The court heard testimony that clearly indicates that the minor child is safe and well cared for within the MGM's home. The court is confident that if the child were to primarily live with Mother at the MGM's home that the child would be appropriately cared for by the adults in her life. The court's concern is with the effect of the continued hostility of Mother and unfortunately the mirrored hostility of the MGM toward

Father. This hostility had the appearance of stigma based on the perception of lower socio-economic class status of Father and his extended family. [¶] … The MGM credibly testified that there has been conflict between herself and April [G.] The hostility is clearly mutual and problematic."

Thereafter, the family court addressed the testimony of Northey's father, whom the court designated as the maternal grandfather or MGF. The court observed: "[MGF] testified as well. He appeared to be a stable influence on the family. He is credible. He testified that the minor child treats the MGF's home [as] 'home.' The minor often was upbeat before exchanges but preferred to stay home [i.e., at MGF's home].… [MGF] indicated that he has not had any problems at exchanges. The court was relieved that his testimony did not include the constant disparagement of Father and [had] the appearance of the ability to cooperate for the sake of the child. The court was well pleased with his involvement in the child's life and encourages the maintenance of this relationship."

The family court moved on to summarizing Northey's testimony. The court noted:

> "Kendra Northey, Mother, testified. Her testimony is best summarized as a list of complaints against father and his family. She at no point indicated that she was anything but disappointed with him and his family. She indicated that she was very upset with [online] postings by April [G.] (Exhibit 7). This post is seeking funds for the legal battle to keep the child (her stepdaughter) with her and Father, [and] is in very poor taste and clearly is a contributor to the hostility between the members of the family. It was clearly an unwise move and reflects poorly on [April's] judgment and maturity. In the court's opinion the post was not illegal but creates a problem for the court as it is clear that [April] is directly involved with the child and this incident reflects adversely on her ability to occupy a 'quasi-parental' role in the child's life with [her own] children.
>
> "[April] is further compromised by her criminal history. The court takes judicial notice of its own records, files and order [from her criminal case]. Specifically, the complaint … and [the] minutes [of the plea hearing and sentencing]. In the criminal matter[,] [April] plead[ed] to a violation of Penal Code [section] 273a[, subdivision] (b)[.] [April] was ordered to four

16.

years formal probation with conditions including attending a Child Abusers Treatment Counseling Program.

"The court has no credible evidence from either party suggesting that [April] has had further problems with the law or other events reflecting very poor judgment. Mother believes that [April] is occupying a parental role with the minor child. This is likely true based on the degree that Father relies on [April] to participate in family decision making and to secure and schedule appointments to manage the needs of the family.

"Mother appeared to be insistent on establishing that Father and [April] are not married. It is likely that her intent was to prove that Father and [April] are lying. The court does not find the marital status of [April] and Father useful or critical to evaluating the relationships the child has with both [April's] children as well as with [April] herself. The child is entitled to maintain any safe and healthy relationship she desires within the context of the family she finds herself. The distinction of whether or not Father and [April] are married is immaterial if the relationship demonstrates longevity and permanence. The court has no information that Father is not in a committed relationship with [April]. The court finds that functionally, Father's family is well situated to provide a loving and reasonably safe environment for all three children in the home. There does not appear to be any harmful conflict within the household.

[¶] … [¶]

"In reviewing Mother's testimony it was clearly apparent to the trier of fact that Mother was evasive, nonresponsive and demonstrated limited or selective memory. Cross-examination did little to bolster either side on the testimony adduced but crippled mother's credibility and demonstrated open hostility to father and his counsel. The most compelling aspect of the testimony on cross was the fact that Mother demonstrated in real time her default mode of dealing with Father. It was hostile and concerning.

"Mother testified [on] cross about an incident that occurred concerning her brother. There was an incident where Mother had to flee the home due to violence perpetrated by her brother. The court has concerns but it appears that this individual is appropriately separated from the family and the minor child has not been exposed to any danger after the incident."

The family court also summarized Cosenza's testimony. The court stated:

"Father's testimony established that he is currently employed as a tow truck driver. He

17.

indicated that he filed the action because Mother had threatened to leave and take the child. He has a committed relationship with April [G.] and the minor child is a part of the family and is involved with her 'stepsiblings.' April does carry the majority of the maintenance work load for the family. She is heavily involved in setting appointments and providing for the daily marshalling of the members of the household[.] His testimony was not highly probative on the issues above but did establish that he is an involved parent who cares about his daughter. He is not overly critical of Mother in spite of the long history of conflict between the two of them."

The family court next addressed the particulars of the schools proposed by the parties. The court observed: "Mother has access to the Clovis School District. While there was little evidence introduced, the Clovis School District has an excellent reputation in the Central Valley. Father's proposed school is located on Lemoore Naval Air Station. As such it is a school located on a secure facility and serves a community of children of military families. This provides a unique environment that offers its own advantages. The attendance of the minor child on the base is possible through [April's] base employment. Father and Mother will need sponsored access to the base, through [April], to gain access to the child while on base and the school. Father assured the court that this is not a problem but it is a step that is needed. In looking at the schools, the court is satisfied that the child will benefit from an education at either school."

In addition, the family court noted: "Both parents are employed and have maintained employment sufficient to provide for the child. Neither parent is avoiding their respective duty to maintain employment to support the needs of the child."

Finally, the family court set forth its findings and order. Preliminarily, the court observed: "In considering this matter the court has considered the court's orders contained in the court file, the continuity and stability of the parenting plan, the age of the child and the willingness of each parent to put the interests of the minor child above the parents' individual interests. As indicated herein the court is deeply concerned about the

18.

level of conflict demonstrated by the Mother and Maternal Grandmother. They … both demonstrate a strident opposition to Father and any benefit that he might provide to the Child. Mother in particular has a demonstrated inability to co-parent." The court added: "The court has concerns about both households. However, none of the concerns rise to the level where the minor child is suffering detriment. Both households are sufficient to meet the minor child's immediate and long-term needs, and the child is surrounded by people who love her and seek to protect her."

The family court continued: "The primary factor after consideration of all the evidence is the persistent hostility of Mother and the Maternal Grandmother toward Father and his family. This hostility has been documented in the Court file and was demonstrated during the CCRC session and then again on the record before the court. The court shares Mr. Coronado's concern that, Mother's behavior, if it does not improve, may require agency-supervised visits."

The family court concluded: "Accordingly the court finds that the Minor Child's best interests are served by attending school in Kings County and an award of sole legal and physical custody to Father. The court adopts the recommendation of Mr. Coronado and adds a provision giving mother the right to authorize emergency medical care when the minor child is with her." The court's order further provided: "The child shall reside with Mother on the 1st, 3rd, and when applicable the 5th Friday of every month from 6:00 p.m. until Sunday at 6:00 p.m."

## DISCUSSION

### I. Applicable Legal Standards

" ' "An application for a modification of an award of custody is addressed to the sound legal discretion of the trial court, and its discretion will not be disturbed on appeal unless the record presents a clear case of an abuse of that discretion." ' " (*In re Marriage of McLoren* (1988) 202 Cal.App.3d 108, 111–112; see *Montenegro v. Diaz* (2001) 26 Cal.4th 249, 255 [custody and visitation orders are subject to the " 'deferential abuse of

19.

discretion test' " and must be upheld if " 'correct on any basis, regardless of whether such basis was actually invoked' "].)  Generally, a trial court abuses its discretion "only if there is no reasonable basis upon which the trial court could conclude that its decision advanced the best interests of the child."  (*In re Marriage of Melville* (2004) 122 Cal.App.4th 601, 610.)

" 'The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power.' "  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566 (*Denham*); *Rich v. Thatcher* (2011) 200 Cal.App.4th 1176, 1182.)  To establish an abuse of discretion, the appellant must demonstrate that the court exceeded the bounds of reason. It is not enough to argue that a different order would also have been within the range of reason.  (*Denham*, at p. 566.)  And it is a "settled rule of appellate review [that] a trial court's order/judgment is presumed to be correct, error is never presumed, and the appealing party must affirmatively demonstrate error on the face of the record."  (*People v. Davis* (1996) 50 Cal.App.4th 169, 172.)

In evaluating the factual basis for an exercise of discretion, we also give broad deference to the trial judge.  (*Rich v. Thatcher, supra*, 200 Cal.App.4th at p. 1182.)  The trial court's factual findings must be upheld if supported by substantial evidence.  (See, e.g., *Osgood v. Landon* (2005) 127 Cal.App.4th 425, 435–436; *In re Marriage of Edlund & Hales* (1998) 66 Cal.App.4th 1454, 1473–1474.)

"Under California's statutory scheme governing child custody and visitation determinations, the overarching concern is the best interest of the child."  (*Montenegro v. Diaz, supra*, 26 Cal.4th at p. 255.)  "The court has ' "the widest discretion to choose a parenting plan that is in the best interest of the child," ' but 'must look to *all the circumstances* bearing on the best interest of the minor child.' "  (*Id.* at p. 256; see Fam.

Code,[9] § 3040, subd. (e) ["This section establishes neither a preference nor a presumption for or against joint legal custody, joint physical custody, or sole custody, but allows the court … the widest discretion to choose a parenting plan that is in the best interest of the child."].)  "When determining the best interest of the child, relevant factors include the health, safety and welfare of the child, any history of abuse by one parent against the child or the other parent, and the nature and amount of contact with the parents." (*Montenegro v. Diaz*, *supra*, at p. 355; see § 3020, subds. (a), (c); see also § 3011 [listing factors the court shall consider in making a determination of the best interests of the child].)

We must uphold a court's custody order if it can be "reasonably concluded that the order ... advance[s] the 'best interest' of the child." (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32.)  In other words, " ' "[a]n appellate tribunal is not authorized to retry the issue of custody, nor to substitute its judgment for that of the trier of facts.  Only upon a clear and convincing showing of abuse of discretion will the order of the trial court in such matters be disturbed on appeal.  Where minds may reasonably differ, it is the trial judge's discretion and not that of the appellate court which must control." ' " (*Catherine D. v. Dennis B.* (1990) 220 Cal.App.3d 922, 931.)

## II. Family Court's Custody Determination Did Not Constitute Abuse of Discretion

### A. Cosenza Requested the Family Court to Adopt Coronado's Recommendation

Northey first complains that the family court adopted Coronado's custody recommendation in favor of Cosenza even though Cosenza himself "was never seeking full legal and physical custody of the minor."  Northey is incorrect.  Cosenza's counsel, at the conclusion of his closing argument, specifically requested the court to adopt

---

[9] Undesignated statutory references are to the Family Code.

Coronado's recommendation that the court award sole legal and physical custody of K.C. to Cosenza.

Cosenza's counsel concluded his closing argument as follows: "And at this time we believe it is in the best interest of [K.C.] to follow [Coronado's] recommendation and adopt it." Northey's counsel asked for clarification. Cosenza's counsel repeated: "Well, in my argument the request is that the recommendation be adopted." Northey's counsel again stated, "I just want to know what you're asking for." Cosenza's counsel reiterated: "What we're asking for is in the recommendation. But also what the recommendation states is in the recommendation, and at this point at the end of this trial *we are asking that the recommendation be adopted*." (Italics added.)

### B. The Family Court Properly Considered K.C.'s Best Interests in Making Its Custody Determination

Northey next argues "the [family] court did not take [K.C.'s] best interests into consideration" in making its custody determination. (Capitalization omitted.) We disagree.

The family court's order is comprehensive and detailed and reflects the court's thorough consideration of all the factors that bear on the best interests of K.C. The court carefully considered multiple documents in the court's custody file as well as the history of Northey and Cosenza's co-parenting relationship reflected therein; the report, recommendation, and testimony of CCRC Coronado (the parties had stipulated Coronado was an expert in child custody recommending counseling); the testimony and demeanor of all trial witnesses, including Northey and Cosenza; the physical altercation between Northey and her brother; the fact a temporary restraining order had been issued against Northey in the past on grounds of domestic violence against Cosenza; Cosenza's misrepresentation that he and April were married; the contentiousness between Northey and Northey's mother on the one hand and April on the other hand; and April's prior conviction under Penal Code section 273a, subdivision (b), among various other factors.

It should be noted that the record is silent as to the facts underlying April's misdemeanor conviction and no information was presented at trial beyond the fact of the conviction and sentence. Further, Coronado pointed out that April's prior conviction did not appear to be an issue in past custody agreements and orders and that Northey continued to support weekend visitation with Cosenza at the home he shared with April. We also note that the documentary exhibits related to April's prior misdemeanor conviction are not in the record on appeal.

Finally, the family court was concerned that despite the fact that Northey had been admonished previously with regard to intemperate conduct and had taken classes to learn co-parenting skills, she demonstrated such poor conduct at the child custody recommending counseling session that Coronado raised the possibility that agency-supervised visitation might be warranted for Northey in the future.

We conclude Northey has not established that the family court's order was an abuse of discretion.

### C. The Family Court Properly Considered Logistical Issues Related to Akers Elementary School

Northey further argues the family court abused its discretion in ordering that K.C. attend school in Kings County, currently Akers Elementary at Naval Air Station Lemoore. Northey states this placement requires April's involvement "to provide access to the school through her employer – a move that seems layered [with] complexity and potential for complications in the future should [Cosenza and April] separate."

Cosenza responds: "[Northey's] concern that [April] might revoke base access … is based on conjecture about future conflicts, not on a demonstrated problem … and the mere possibility of a future dispute does not outweigh the trial court's reasoned judgment regarding the minor's educational placement."

Here, the family court was aware of April's role in facilitating the parties' access to the naval base and, in turn, to Akers Elementary and carefully considered the issue.

The court noted there were no signs of conflict in Cosenza's relationship with April. Moreover, Northey testified there had not been any instance when she needed to go to Akers Elementary but was unable to access it.

We conclude Northey has not shown the family court abused its discretion in ordering that K.C. attend school in Kings County.

## **DISPOSITION**

The family court's February 3, 2025 custody order is affirmed. Each party to bear his or her own costs on appeal.